# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SMART APPROACHES TO MARIJUANA<br>220 Maryland Ave NE, Washington, DC 20002,<br><br>CANNABIS INDUSTRY VICTIMS EDUCATING LITIGATORS<br>203 Main St, Suite 250, Flemington, NJ 08822,<br><br>NORTH CAROLINIANS AGAINST LEGALIZING MARIJUANA<br>1854 Hendersonville Rd, Suite 205, Asheville, NC 28803,<br><br>CANNABIS IMPACT PREVENTION COALITION, LLC<br>418 Broadway, Suite N, Albany, NY 12207,<br><br>CANNABIS INDUSTRY VICTIMS SEEKING JUSTICE<br>418 Broadway, Suite N, Albany, NY 12207,<br><br>DRUG FREE AMERICA FOUNDATION<br>333 3rd Ave N, Suite 200, St. Petersburg, FL 33701,<br><br>SAVE OUR SOCIETY FROM DRUGS<br>333 3rd Ave N, Suite 200, St. Petersburg, FL 33701,<br><br>DRUG WATCH INTERNATIONAL<br>6981 Tepper Dr, Clifton, VA 20124,<br><br>HILLSBOROUGH COUNTY ANTI-DRUG ALLIANCE<br>521 Lantern Circle, Temple Terrace, FL 33617, | Case No. _____ |

ILLINOIS FAMILY INSTITUTE
PO Box 876, Tinley Park, IL 60477,

and

DAVID EVANS
10 Elmwood Lane, Asheville, NC 28803,

 *Plaintiffs*,

v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and
Human Services,

THE UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

MEHMET OZ, M.D., in his official
capacity as Administrator of the Centers
for Medicare & Medicaid Services,

and

THE CENTERS FOR MEDICARE &
MEDICAID SERVICES,

 *Defendants*.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Patrick Kenneally
Connor W. Mighell
**BURKE LAW GROUP, PLLC**
1000 Main Street, Suite 2300
Houston, Texas 77002
Telephone: (832) 987-2214
Fax: (832) 793-0045
patrick.kenneally@burkegroup.law
connor.mighell@burkegroup.law

**Attorneys for Plaintiffs**

## I.    INTRODUCTION

1.    On March 20, 2026, the Centers for Medicare & Medicaid Services ("CMS") created a program to distribute hemp-derived products containing the Schedule I substance delta-9 tetrahydrocannabinol ("THC") to Medicare beneficiaries. CMS called this program the Substance Access Beneficiary Engagement Incentive ("BEI"). The BEI imposes binding rules on participating health care providers. These rules include how doctors and patients officially sign up and which doctors are eligible to distribute these products, create detailed implementation plans that must first be approved by CMS, set THC limits and other product specifications, and require quarterly reporting by providers. The BEI does not involve the Food and Drug Administration ("FDA")'s medicine approval process.

2.    CMS published no Notice of Proposed Rulemaking for the BEI, solicited no public comments, offered no reasonable explanation for its action, bypassed the Federal Register, gave eleven days' notice before the BEI's implementation, and contradicted *sub silentio* its own April 2025 final rule that declared cannabis products ineligible for supplemental Medicare coverage for chronically ill patients. 90 Fed. Reg. 15,792, 15,867 (Apr. 15, 2025).

3.    The BEI violates the Administrative Procedure Act ("APA") in three ways.

4.    *First*, the BEI's obligations are the hallmarks of a legislative rule requiring notice-and-comment rulemaking under the APA. CMS's failure to solicit notice and comment violated 5 U.S.C. §§ 553 and 706(2)(D). CMS cannot evade notice-and-comment by embedding a substantive rule in a participation agreement.

5. *Second*, CMS reversed its prior rule without explanation, ignored well-documented health risks to elderly Americans (including a two-fold increase in cardiovascular death risk, an increase in the risk of developing or exacerbating mental health disorders, and pervasive contamination of CBD products), disregarded the absence of any FDA regulatory framework, and launched a program that violated the 0.4mg-per-container ceiling set by the 2026 Agriculture Appropriations Act by permitting the distribution of products with up to 3 mg of THC per serving. As such, the BEI is facially arbitrary, capricious, and not in accordance with law, in violation of 5 U.S.C. § 706(2).

6. *Third*, the BEI exceeds CMS's statutory authority in violation of the major questions doctrine. Section 1115A of the Social Security Act, under which the BEI is promulgated, allows CMS to test payment and delivery models for Medicare services. It does not allow CMS to sanction the possession and use of illegal and dangerous Schedule I substances by Medicare patients without clear congressional authorization.

7. CMS's action represents an unprecedented and unlawful assertion of binding decision-making authority that will profoundly affect the health of elderly Americans. CMS took this action without the guardrails imposed by the administrative process, without any reasoned explanation, in conflict with the agency's own recent APA-compliant determination, and without statutory authority. Plaintiffs bring this action under the APA, 5 U.S.C. § 701–706, to vacate the BEI, declare it unlawful, and permanently enjoin its implementation.

## II.    PARTIES

### A.    Plaintiffs

8.      Smart Approaches to Marijuana, Inc. ("SAM") is a corporation headquartered at 220 Maryland Ave NE, Washington, D.C. 20002 and incorporated in Virginia. SAM's mission includes education and advocacy regarding the public health and safety impacts of marijuana and cannabis policy. SAM operates concrete programmatic activities, including public health education campaigns directed at healthcare providers and patients, direct information services regarding cannabis-related health risks, and research and policy analysis programs. SAM is a participant in the ongoing Drug Enforcement Administration marijuana rescheduling proceedings as an interested party in opposition to the Notice of Proposed Rulemaking. *See* Exhibit A. The BEI directly impairs SAM's core programmatic activities by requiring SAM to redirect staff and resources from its ongoing patient and provider education programs to monitor, analyze, and provide direct informational services to its members and stakeholders regarding the BEI's implications for vulnerable seniors, as well as engage in this litigation. The BEI provides marijuana products via a medical source, meaning that SAM's expenditure of resources opposing rescheduling of marijuana in administrative proceedings has been rendered essentially moot. SAM's injury is not abstract policy disagreement but concrete impairment of specific programmatic activities with a consequent drain on organizational resources. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). In addition, SAM's donor, volunteer, and consultant David Evans is a Medicare beneficiary aligned with an ACO REACH participant provider who has been injured by the denial of his right to participate in notice-and-comment rulemaking, and

in the alteration of his healthcare relationship due to the BEI. SAM also has an informational interest in the administrative record that would have been developed had the BEI proceeded through formal rulemaking, and has been deprived of its participatory interest in shaping the regulatory process through providing comments.

9.     Cannabis Industry Victims Educating Litigators ("CIVEL") is an organization based in New Jersey. CIVEL's mission includes educating legal professionals and the public about the harms caused by the cannabis industry. CIVEL operates concrete programmatic activities including legal education seminars, victim assistance programs, and community outreach. CIVEL is a participant in the ongoing administrative process opposing the rescheduling of cannabis. The BEI has directly impaired CIVEL's core programmatic activities by requiring diversion of resources from its victim assistance and legal education programs. In addition, CIVEL's Senior Counsel and Executive Director David Evans is a Medicare beneficiary aligned with an ACO REACH participant provider who has been injured by the denial of his right to participate in notice-and-comment rulemaking, and in the alteration of his healthcare relationship due to the BEI. Additionally, CIVEL has an informational interest in the administrative record that would have been developed had the BEI proceeded through formal rulemaking, and has been deprived of its participatory interest in shaping the regulatory process through providing comments.

10.    North Carolinians Against Legalizing Marijuana ("NCALM") is an organization based in Asheville, North Carolina, and is registered with the North Carolina Secretary of State for lobbying purposes. NCALM's mission includes opposing

4

the legalization of medical hemp-derived and marijuana products in North Carolina and advocating that only medicines produced and distributed with standard best-practice pharmaceutical protocols and approved by the FDA should be available to patients. NCALM operates concrete programmatic activities including legislative advocacy, public education campaigns, and policy analysis regarding the risks of marijuana. The BEI has directly affected and interfered with NCALM's core programmatic activities beyond its issue-advocacy or mission, because the BEI authorizes the distribution of cannabis- and hemp-derived products that have not been approved by the FDA—the very outcome NCALM's programs are designed to prevent. NCALM's Executive Director David Evans is a Medicare beneficiary aligned with an ACO REACH participant provider who has been injured by the denial of his right to participate in notice-and-comment rulemaking, and in the alteration of his healthcare relationship due to the BEI. Additionally, NCALM has an informational interest in the administrative record that would have been developed had the BEI proceeded through formal rulemaking, and has been deprived of its participatory interest in shaping the regulatory process through providing comments.

11.    Cannabis Impact Prevention Coalition, LLC ("CIPC") is a corporation organized under the laws of the State of New York. CIPC's mission is to prevent the negative social, health, public safety, and environmental impacts of marijuana. CIPC operates concrete programmatic activities including public education, community outreach, and policy advocacy directed at reducing the harms caused by marijuana use. The BEI has directly affected and interfered with CIPC's core programmatic activities

beyond its issue-advocacy or mission. CIPC's Executive Director David Evans is a Medicare beneficiary aligned with an ACO REACH participant provider who has been injured by the denial of his right to participate in notice-and-comment rulemaking, and in the alteration of his healthcare relationship due to the BEI. Additionally, CIPC has an informational interest in the administrative record that would have been developed had the BEI proceeded through formal rulemaking, and has been deprived of its participatory interest in shaping the regulatory process through providing comments.

12.     Cannabis Industry Victims Seeking Justice ("CIVSJ") is a corporation organized under the laws of the State of New York. CIVSJ's mission is to make the marijuana industry legally accountable to its victims and to provide advocacy services to the many victims of the cannabis industry. CIVSJ operates concrete programmatic activities including victim advocacy, legal accountability initiatives, and public education regarding the harms caused by the cannabis industry. The BEI has directly affected and interfered with CIVSJ's core programmatic activities beyond its issue-advocacy or mission. CIVSJ's Executive Director David Evans is a Medicare beneficiary aligned with an ACO REACH participant provider who has been injured by the denial of his right to participate in notice-and-comment rulemaking, and in the alteration of his healthcare relationship due to the BEI. Additionally, CIVSJ has an informational interest in the administrative record that would have been developed had the BEI proceeded through formal rulemaking, and has been deprived of its participatory interest in shaping the regulatory process through providing comments.

6

13.    Drug Free America Foundation ("DFAF") is a nonprofit organization based in Florida. DFAF is a drug prevention and policy organization committed to developing strategies and educational programs that prevent drug use and promote sustained recovery. The BEI has directly affected and interfered with DFAF's core programmatic activities beyond its issue-advocacy or mission by requiring diversion of resources from its programs, including drug prevention education programs, student assistance initiatives, community outreach, workplace drug prevention programs, and related operational activities. DFAF's consultant and volunteer David Evans is a Medicare beneficiary aligned with an ACO REACH participant provider who has been injured by the denial of his right to participate in notice-and-comment rulemaking, and in the alteration of his healthcare relationship due to the BEI. Additionally, DFAF has an informational interest in the administrative record that would have been developed had the BEI proceeded through formal rulemaking, and has been deprived of its participatory interest in shaping the regulatory process through providing comments.

14.    Save Our Society from Drugs ("SOS") is a nonprofit organization based in Florida. Its mission includes establishing, promoting, and enabling sound drug laws and policies that will reduce illegal drug use, drug addiction and drug-related illness and death. The BEI has directly affected and interfered with SOS's core programmatic activities beyond its issue-advocacy or mission by requiring diversion of resources from its programs, including drug prevention education programs, public awareness campaigns, community intervention initiatives, support and resources for professionals working in fields impacted by drug use and abuse, and related operational activities.

7

SOS's consultant and volunteer David Evans is a Medicare beneficiary aligned with an ACO REACH participant provider who has been injured by the denial of his right to participate in notice-and-comment rulemaking, and in the alteration of his healthcare relationship due to the BEI. Additionally, SOS has an informational interest in the administrative record that would have been developed had the BEI proceeded through formal rulemaking, and has been deprived of its participatory interest in shaping the regulatory process through providing comments.

15.     Drug Watch International ("DWI") is a nonprofit organization based in Virginia. Its mission includes promoting "healthy drug-free cultures" globally, advocating for the prohibition of and abstinence from all drugs including alcohol and tobacco, and opposing the legalization of drugs prohibited by national and international laws. The BEI has directly affected and interfered with DWI's core programmatic activities beyond its issue-advocacy or mission by requiring diversion of resources from its programs. Since the BEI was announced, DWI's board and members have spent considerable time on collecting and disseminating information about cannabis- and hemp-derived products and the BEI to its stakeholders and constituents, thus diverting members from the mission of Drug Watch International, Inc., which seeks to prevent the abuse of all drugs, not just cannabis, through education, prevention, and treatment. DWI's member David Evans is a Medicare beneficiary aligned with an ACO REACH participant provider who has been injured by the denial of his right to participate in notice-and-comment rulemaking, and in the alteration of his healthcare relationship due to the BEI. Additionally, DWI has an informational interest in the administrative record

8

that would have been developed had the BEI proceeded through formal rulemaking, and has been deprived of its participatory interest in shaping the regulatory process through providing comments.

16.     Hillsborough County Anti-Drug Alliance ("HCADA") is a nonprofit organization based in Florida. Its mission includes engaging in community-based alcohol, tobacco, and substance abuse education and prevention activities, as well as participation in the development of related planning strategies statewide. The BEI has directly affected and interfered with its core programmatic activities beyond its issue-advocacy or mission by requiring diversion of resources from its other programs and activities, including legislative advocacy, education, community outreach, and volunteering. Additionally, HCADA has an informational interest in the administrative record that would have been developed had the BEI proceeded through formal rulemaking, and has been deprived of its participatory interest in shaping the regulatory process through providing comments.

17.     Illinois Family Institute ("IFI") is a nonprofit organization based in Illinois. Its mission includes advancing public policy initiatives consistent with Judeo-Christian teachings and traditions, including opposition to access to illegal drugs, educating citizens so that they can better influence their local communities and the state. IFI has an informational interest in the administrative record that would have been developed had the BEI proceeded through formal rulemaking, and has been deprived of its participatory interest in shaping the regulatory process through providing comments.

18.     David Evans is a Medicare beneficiary aligned with an ACO REACH participant provider who has been injured by the denial of his right to participate in notice-and-comment rulemaking, and in the alteration of his healthcare relationship due to the BEI.

### B.     Defendants

19.     Defendant Robert F. Kennedy, Jr. is the Secretary of Health and Human Services. He is sued in his official capacity. Secretary Kennedy oversees the Department of Health and Human Services, which houses CMS, and bears ultimate responsibility for the adoption and implementation of the BEI.

20.     Defendant United States Department of Health and Human Services ("HHS") is an executive department of the United States government responsible for administering federal healthcare programs, including the Medicare program.

21.     Defendant Mehmet Oz, M.D. is the Administrator of the Centers for Medicare & Medicaid Services. He is sued in his official capacity. Administrator Oz publicly announced in December 2025, at the signing ceremony for Executive Order No. 14370, that "millions of Americans on Medicare" would become eligible to receive cannabis products "as early as April of next year—and at no charge if their doctors recommend them." Administrator Oz has played a central role in the development and public promotion of the BEI.

22.     Defendant Centers for Medicare & Medicaid Services ("CMS") is a federal agency within HHS. CMS administers the Medicare program and operates the Center for

Medicare & Medicaid Innovation ("Innovation Center"), which developed and published the BEI.

### III.   JURISDICTION AND VENUE

23.     Plaintiffs bring this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. The APA provides a right of review under 5 U.S.C. § 702 for persons adversely affected or aggrieved by agency action and under 5 U.S.C. § 704 for final agency action for which there is no other adequate remedy in a court.

24.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 5 U.S.C. §§ 701-706 (APA) and 28 U.S.C. § 2201 (Declaratory Judgment Act). The relief requested is authorized by 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701-706 (APA).

25.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

26.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e)(1) because the defendants are officers and agencies of the United States and this action is brought where the agency defendants maintain their principal offices. Venue is also appropriate under 5 U.S.C. § 703.

27.     An actual, justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

28.     The federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

29.     Plaintiffs have exhausted all administrative remedies, the agency action is final and ripe for review, and all Plaintiffs have standing because they are injured in fact because of the defendants' actions or omissions and this court has the power to redress those injuries.

### A.     Final Agency Action

30.     The BEI constitutes final agency action because it (1) "mark[s] the consummation of the agency's decision-making process" and is "not . . . of a merely tentative or interlocutory nature" and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up); *see also United States Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). It was published to CMS's website on March 20, 2026, with an effective date of April 1, 2026. It imposes binding requirements regarding participant election, submission of an implementation plan, eligibility determinations, and quarterly reporting to CMS. These requirements complete CMS's decision-making and produce concrete legal consequences for participating organizations and Medicare beneficiaries aligned with them. *See Bennett*, 520 U.S. at 178 (action is final where it has "direct and appreciable legal consequences").

### B.     The Section 1115A Review Bar Does Not Apply

31.     Section 1115A of the Social Security Act, 42 U.S.C. § 1315a(d)(2), bars judicial review of "the selection of models for testing," "the selection of organizations, sites, or participants," and "the elements, parameters, scope, and duration" of Innovation Center models.

32.     Plaintiffs do not challenge any of these enumerated decisions. Plaintiffs challenge the procedures CMS used to adopt and publish the BEI by bypassing APA rulemaking and exceeding its statutory authority. *See Regeneron Pharmaceuticals, Inc. v. United States HHS*, 510 F. Supp. 3d 29, 42 (S.D.N.Y. 2020) (holding that Section 1115A "does not bar review of the propriety of the procedures used" to establish models); *see also Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986) (recognizing a "strong presumption that Congress intends judicial review of administrative action").

### C.    Medicare Channeling Does Not Apply

33.     Plaintiffs do not seek benefits determinations, reimbursement calculations, or participant-specific Medicare payment review. No adequate administrative remedy exists for this pre-enforcement APA challenge to CMS's procedural deficiencies in adopting the BEI. *See Shalala v. Illinois Council on Long Term Care*, 529 U.S. 1, 19 (2000) (channeling requirements do not apply where they would result in "complete preclusion of judicial review").

## IV.   STANDING

### A.    Individual and Associational Standing

34.     David Evans is a 78-year-old Medicare beneficiary with individual standing to sue.

35.     Mr. Evans is a donor, consultant, and volunteer for SAM.

36.     Mr. Evans is Executive Director and Senior Counsel of CIVEL.

37.     Mr. Evans is Executive Director of NCALM, CIPC, and CIVSJ.

38.     Mr. Evans is a consultant and volunteer of DFAF.

39.     Mr. Evans is a consultant and volunteer of SOS.

40.     Mr. Evans is a member of DWI.

41.     Mr. Evans is a Medicare beneficiary who is aligned with Hopscotch Primary Care, PLLC. This provider has joined ACO REACH as part of Physicians Healthcare Collaborative ACO, and faces imminent implementation of the BEI beginning April 1, 2026.

42.     Mr. Evans was deprived of his right to participate in notice-and-comment rulemaking as an interested party. Mr. Evans is opposed to expanded access to cannabis- and hemp-derived products, and does not want them provided by his Medicare provider, due to their serious health risks. Mr. Evans also has extensive evidence of the harms caused by these products. Because there was no opportunity for public comment on the BEI, Mr. Evans could not submit this evidence to CMS.

43.     The following Plaintiffs have associational standing: SAM; CIVEL; NCALM; CIPC; CIVSJ; DFAF; SOS; and DWI (collectively, the "Associational Plaintiffs").

44.     At least one identified member of each Plaintiff, namely Mr. David Evans, has standing to sue in his own right.

45.     The interests each Associational Plaintiff seeks to protect—including public health, product safety, and lawful agency procedure—are germane to their purposes.

46.     Finally, neither the claims asserted nor the declaratory and injunctive relief requested requires the participation of individual members.

### B.     Procedural Standing

47.     All Plaintiffs assert the denial of their right to participate in notice and comment rulemaking under 5 U.S.C. § 553. They have suffered a "reasonably increased

14

risk of injury" to their particularized interests due to CMS's decision to create and institute the BEI without the required procedure. *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 38 (D.D.C. 2020); *see also Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

48.     Plaintiffs' concrete interests include: (1) the health and safety of their individual members who are Medicare beneficiaries exposed to the BEI, including Mr. Evans, (2) the informational interest in the administrative record that would have been developed through notice and comment rulemaking, and (3) the participatory interest in shaping the regulatory outcome through the procedures Congress established.

49.     Plaintiffs SAM and CIVEL are also involved in ongoing administrative proceedings opposing the DEA's efforts to expand access to cannabis through rescheduling under the Controlled Substances Act. *See* Exhibit A (order granting SAM and CIVEL standing in DEA administrative proceeding). They are injured by their inability to comment on the BEI, which seeks to expand access to cannabis for certain Americans.

### C.     Organizational Standing

50.     All Plaintiffs except for David Evans and Illinois Family Institute (collectively, the "Organizational Plaintiffs") have organizational standing to sue.

51.     Organizational Plaintiffs' primary interest is in preventing the expansion of access to cannabis products and proper use of the FDA medicine approval process. They have standing to challenge CMS's action in creating and instituting the BEI on their own behalf due to concrete and demonstrable injury to these respective interests.

15

52. Moreover, CMS's action has impaired specific, concrete programmatic activities undertaken by Organizational Plaintiffs, including direct patient education services, clinician training programs, community health intervention programs, and victim assistance operations, by requiring diversion of resources from these programs to counteract the public health and societal effects of the BEI. This constitutes an injury to each Organizational Plaintiff's respective organizational interests. *See People for the Ethical Treatment of Animals v. United States Department of Agriculture*, 797 F.3d 1087, 1094 (D.C. Cir. 2015).

53. Organizational Plaintiffs have standing to challenge the BEI because counteracting it requires diversion of resources from their efforts to prevent rescheduling of cannabis through the administrative process.

## V.    LEGAL STANDARD

54. Under 5 U.S.C. § 706(2), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law . . . ."

55. The court must examine whether the agency has "examined the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). Agency action

16

must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

56.     Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), courts must "exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the [APA] requires." *Id.* at 413. Courts "need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.*

## VI.   FACTUAL ALLEGATIONS

### A.   The CMS Innovation Center

57.     Section 1115A of the Social Security Act, 42 U.S.C. § 1315a, established the Center for Medicare & Medicaid Innovation ("Innovation Center") within CMS. The Innovation Center's statutory purpose is to test "innovative payment and service delivery models" to reduce program expenditures "while preserving or enhancing the quality of care" for "individuals who are enrolled under such titles and . . . for defined populations with deficits in care leading to poor clinical outcomes or potentially avoidable expenditures." 42 U.S.C. § 1315a(a)(1).

58.     The specific models at issue are ACO REACH (a model for accountable care organizations), the Enhancing Oncology Model or EOM (a model for oncology care), and the LEAD Model (an upcoming model for community-level addiction and overdose treatment). These are payment and delivery models.

59.     The ACO Reach brings together doctors, hospitals and other healthcare providers into a single team called an Accountable Care Organization (ACO). *See Innovation Models: ACO REACH*, Ctrs. for Medicare & Medicaid Servs.,

17

https://www.cms.gov/priorities/innovation/innovation-models/aco-reach. These teams coordinate patient care, making sure patients get the right tests, follow-up, and preventative services to reduce duplication or unnecessary procedures. *Id.* If the ACO keeps costs below a benchmark while meeting quality standards, the team shares in the savings thereby encouraging providers to work together efficiently to focus on preventive care, chronic disease management, and patient outcomes rather than simply the number of services delivered. *Id.* Currently, there are approximately 74 ACOs made up of approximately 126,000 providers and organizations providing care to approximately 1.7 million Medicare beneficiaries. *Id.*

60. The EOM focuses on Medicare patients with certain cancers and tests a new way of paying oncology practices. *See Innovation Models: EOM*, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/priorities/innovation/innovation-models/eom. Participating clinics are given bundled payments or target budgets for patients' entire course of cancer treatment, rather than being paid separately for every test or procedure. *Id.* The incentive is that if the clinic keeps costs within the target and meets quality and outcome goals, it can earn shared savings bonuses. *Id.* Based on the most recent publicly available information, the total number of Medicare participants is unknown. *Id.* However, 28 physician group practices and one commercial payer are participating, accounting for approximately 2,000 practitioners across more than 350 care sites. *Id.*

61. The BEI also applies to another payment model, LEAD, which does not begin until January 1, 2027. *See LEAD (Long-Term Enhanced ACO Design) Model*, Ctrs. for

18

Medicare & Medicaid Servs., https://www.cms.gov/priorities/innovation/innovation-models/lead.

62.     Section 1115A was designed to test payment and delivery models, not to create access to specific consumer products.

## B.     CMS's Position on Cannabis Products

63.     In April 2025, CMS issued a final rule, effective June 3, 2025, that states that "medical marijuana or derivatives, such as cannabis oil, cannot be covered by [Medicare Advantage] organizations as they are illegal substances under Federal law." 90 Fed. Reg. 15,792, 15,867 (Apr. 15, 2025) (codifying "cannabis products" as non-allowable special supplemental benefits for the chronically ill ("SSBCI")).

64.     To date, CMS has not rescinded this rule.

65.     Yet, the BEI allows access to cannabis products for Medicare Advantage beneficiaries. This contradictory position was issued without any reasoned explanation.

## C.     Executive Order No. 14370

66.     On December 18, 2025, President Donald J. Trump signed Executive Order No. 14370, titled "Increasing Medical Marijuana and Cannabidiol Research."

67.     At the signing ceremony, CMS Administrator Oz publicly stated that "millions of Americans on Medicare" would become eligible to receive cannabis and hemp-derived products "as early as April of next year—and at no charge if their doctors recommend them." This announcement predated any agency action by three months and signaled a predetermined outcome.

## D.     The Substance Access BEI

68.     On March 20, 2026, CMS published the BEI on its website.

19

69.     The BEI is an optional feature embedded in participation agreements for ACO REACH and EOM (effective April 1, 2026) and the LEAD Model (effective January 1, 2027).

70.     For participants in ACO REACH and EOM who elect the BEI, it is a binding, generally applicable framework that imposes legal obligations on participants and their aligned beneficiaries.

71.     The BEI imposes the following mandatory program mechanics, which include: (a) participant election; (b) submission of a CMS-required implementation plan; (c) CMS approval of the implementation plan, with CMS retaining authority to reject or suspend participation; (d) physician determination of beneficiary eligibility, including that the beneficiary is over 18 years of age and does not have a disqualifying condition[1]; (e) shared decision-making with beneficiaries; (f) cannabis and hemp-derived products provided are limited to 0.3% delta-9 THC per dry weight of the product and in products that are ingested orally, no more than 3 mg per serving of total tetrahydrocannabinols; (g) a $500 annual cap per beneficiary; and (h) quarterly reporting obligations.

72.     CMS claims that Medicare does not pay for the cannabis products or hemp-derived THC products approved under the BEI directly, and that they are funded at the

---

[1] Beneficiaries are not eligible for the BEI if they are not aligned to a participating organization, meets the model's frailty exclusion, is pregnant or breastfeeding, or if a physician does not determine the product is appropriate. *See Substance Access Beneficiary Engagement Incentive*, Centers for Medicare & Medicaid Services (accessed Mar. 27, 2026), https://www.cms.gov/priorities/innovation/substance-access-beneficiary-engagement-incentive. Public-facing CMS documents do not reveal the actual list of "disqualifying conditions" for the BEI.

expense of participants. However, the limited information available about the BEI makes this unclear.

### E. Absence of Notice and Comment

73.    CMS issued no notice of proposed rulemaking and solicited no public comments before announcing and instituting the BEI.

74.    CMS provided no formal administrative record before announcing and instituting the BEI.

75.    CMS provided no reasonable or reasoned explanation for the BEI or for its departure from its April 2025 final rule, 90 Fed. Reg. 15,792, 15,867.

76.    The BEI was not published in the Federal Register, but was announced on March 20, 2026 with a near-immediate effective date of April 1, 2026.

77.    Public statements by hemp-industry stakeholders and later reporting suggest that selected stakeholders may have had advance notice of the BEI before CMS publicly announced the BEI.

78.    On December 18, 2025, Charlotte's Web announced that it was prepared to participate as a CBD provider in a potential Innovation Center pilot. *Charlotte's Web Serves as a Premier CBD Partner for Landmark Medicare and Medicaid Pilot Program*, Charlotte's Web (Dec. 18, 2025), https://investors.charlottesweb.com/press-releases/press-release-details/2025/Charlottes-Web-Serves-as-a-Premier-CBD-Partner-for-Landmark-Medicare-and-Medicaid-Pilot-Program/default.aspx.

79.    Charlotte's Web co-founder Jared Stanley confirmed on February 13, 2026 that the program was "internally finalized" by CMS weeks prior, without public

21

announcement or opportunity to comment, and referred to a "briefing" when discussing the pilot program's anticipated scope. Kyle Jaeger, *Federal Agency Finalized Rule for CBD Medicare Coverage Pilot Program Weeks Ago, Key Hemp Stakeholder Says*, Marijuana Moment (Feb. 13, 2026), https://www.marijuanamoment.net/federal-agency-finalized-rule-for-cbd-medicare-coverage-pilot-program-weeks-ago-key-hemp-stakeholder-says/.

80.    Upon information and belief, Charlotte's Web, a major hemp company, collaborated with CMS in shaping and finalizing the BEI.

81.    At no point was the public afforded any opportunity to participate in the development of the BEI.

**F.    Conflict with the 2026 Agriculture Appropriations Act**

82.    The 2026 Agriculture Appropriations Act, signed by the President, sets a total THC limit of 0.4 mg per container for hemp-derived products, effective November 2026.

83.    CMS's BEI permits 3 mg of total THC per serving, which is more than seven times the statutory limit.

84.    CMS's only response to this conflict has been that it "will adjust its definition in accordance with the law." *See Substance Access Beneficiary Engagement Incentive*, Centers for Medicare & Medicaid Services (accessed Mar. 27, 2026), https://www.cms.gov/priorities/innovation/substance-access-beneficiary-engagement-incentive.

85.    CMS has provided no details on when or how this adjustment will occur nor why it promulgated a program in explicit conflict with clearly established law.

86. Accordingly, CMS launched a program it already knows to be inconsistent with enacted federal law.

**G. Conflict with Established and Documented Health Risks of Cannabis and Hemp-Derived THC Products for Medicare Populations**

87. The BEI allows elderly Americans to access cannabis products, which contain substances that provably cause harm to their health.

88. A 2025 narrative review published in the Journal of the American Medical Association ("JAMA") of 124 recent randomized controlled trials and meta-analysis found that the evidence that cannabis "treats" disorders such as pain, anxiety, post-traumatic stress disorder ("PTSD"), insomnia, and most other hyped uses is weak or non-existent. M. Hsu et al., Therapeutic Use of Cannabis and Cannabinoids: A Review, JAMA (Nov. 26, 2025).

89. The position of the American Psychiatric Association ("APA") as of December of 2025 is that "[t]here is insufficient evidence that cannabis is an effective treatment for any psychiatric disorder." AM. PSYCHIATRIC ASS'N, *Position Statement in Opposition to Cannabis as Medicine for Psychiatric Disorders* (approved by Board of Trustees Dec. 2025 and Assembly Nov. 2025).

90. The scientific evidence documenting cardiovascular, neurological, and other health risks from cannabis and hemp-derived THC products is substantial and directly relevant to the Medicare population, which consists predominantly of adults over 65 (the population most vulnerable to these harms).

91. Heart disease is the leading cause of death among Americans over 65.

92.     A June 2025 meta-analysis published in *Heart* (BMJ), encompassing 24 studies and approximately 200 million participants, found that cannabis use was associated with a two-fold risk of cardiovascular death, a 29% higher risk of acute coronary syndrome, and a 20% higher risk of stroke. Wilhelm Storck et al., *Cardiovascular Risk Associated with the Use of Cannabis and Cannabinoids: A Systematic Review and Meta-Analysis*, 111 Heart 1047 (2025).

93.     A 2024 study published in the *Journal of the American Heart Association*, analyzing data from approximately 434,000 U.S. adults, found that daily cannabis users had a 25% higher risk of heart attack and a 42% higher risk of stroke compared to non-users, with risk increasing in a dose-response fashion with more frequent use. Abra M. Jeffers et al., *Association of Cannabis Use with Cardiovascular Outcomes Among US Adults*, 13 J. Am. Heart Ass'n e030178 (2024).

94.     A May 2025 study published in *JAMA Cardiology* by researchers at the University of California, San Francisco, found that chronic cannabis use—whether smoked or consumed as THC-containing edibles—was associated with vascular endothelial dysfunction comparable to that observed in tobacco smokers. Vascular function in chronic cannabis users was reduced by approximately 50% compared to non-users. *See* Leila Mohammadi et al., *Association of Endothelial Dysfunction with Chronic Marijuana Smoking and THC-Edible Use*, JAMA Cardiology (May 28, 2025).

95.     Memory and cognitive impairment are already prevalent concerns among older adults. THC products appear to worsen these outcomes.

24

96.    A 2025 study found that individuals who presented to the emergency room due to cannabis use were at a 1.5-fold to 3.9-fold increased risk of dementia diagnosis within five years, relative to individuals with all-cause acute care visits and the general population. Daniel T. Myran *et al.*, *Risk of Dementia in Individuals With Emergency Department Visits or Hospitalizations Due to Cannabis*, 82 JAMA Neurology 570–79 (June 2025).

97.    A 2021 study found that long-term marijuana users scored significantly lower on measures of executive function, processing speed, and general cognition than non-users, and that more frequent and more recent use was negatively associated with working memory. Katie Stypulkowski & Rachel E Thayer, *Long-Term Recreational Cannabis Use Is Associated With Lower Executive Function and Processing Speed In A Pilot Sample of Older Adults*, J. Geriatric Psychiatry Neurology (Sept. 2021).

98.    A 2020 study found that fewer than 250 older adults have been included in cannabis studies to date, meaning that there is a substantial body of potential harm to that population that remains unknown to science. Brooke Porter *et al.*, *Cannabidiol (CBD) Use by Older Adults for Acute and Chronic Pain*, 47 J. Gerontological Nursing 7, 6–15 (July 2021).

99.    CMS did not address this research gap before launching a program directed at older adults.

100.    Commercially available CBD products are pervasively contaminated and mislabeled. M.O. Bonn-Miller et al., *Labeling Accuracy of Cannabidiol Extracts Sold Online*, 318 JAMA 17 at 1708–09 (2017).

101.    A peer-reviewed 2022 study published in *Science of the Total Environment*, analyzing 516 CBD products sold in the United States, found that only 42% of products fell within ±10% of the CBD content claimed on the manufacturer's label. Among 121 edible CBD products tested, lead was detected in 42%, mercury in 37%, arsenic in 28%, and cadmium in 8%. Four edible products exceeded the California Proposition 65 threshold for daily lead consumption in two servings. Hannah Gardener et al., *Heavy Metal and Phthalate Contamination and Labeling Integrity in a Large Sample of US Commercially Available Cannabidiol (CBD) Products*, 851 Sci. Total Env't 158110 (2022).

102.    These contamination and accuracy risks are especially acute for older adults, who must carefully manage their medical intake and who are particularly vulnerable to pathogen and toxin exposures. Stacy Cooper Bailey et al., *Longitudinal Investigation of Older Adults' Ability to Self-Manage Complex Drug Regimens*, 68 J. Am. Geriatrics Soc'y 569 (2020); John F. Risher et al., *The Elderly as a Sensitive Population in Environmental Exposures: Making the Case*, 7 Int'l J. Envtl. Res. Pub. Health 228 (2010).

103.    A 2025 study found that even small doses of CBD can cause significant elevations in liver enzymes (specifically alanine aminotransferase and aspartate aminotransferase), indicative of possible liver injury, which can lead to fatigue and jaundice—issues of special concern for older adults seeking to avoid unnecessary hospitalizations. Jeffry Florian, *et al.*, *Cannabidiol and Liver Enzyme Level Elevations in Healthy Adults: A Randomized Clinical Trial*, 185 JAMA Internal Medicine 9, 1070–78 (July 2025).

104.    A 2021 review found that a wide variety of drugs in common use by older people, from blood pressure medications to antifungals, belong to a class called CYP3A4 inhibitors that can interact with CBD and increase the bioavailability of its active chemicals, leading to possible adverse effects. Brooke Porter *et al.*, *Cannabidiol (CBD) Use by Older Adults for Acute and Chronic Pain*, 47 J. Gerontological Nursing 7, 6–15 (July 2021).

105.    The same review noted that older adults can suffer from a condition in which protein binding is inhibited, which can also lead to elevated bioavailability and unintentionally higher dosing. *Id.*

106.    It also noted that patient safety is a concern with CBD use, and that poison phone calls for CBD have increased from 3 in 2014 to 2,218 in 2020. *Id.*

107.    CMS created and instituted the BEI despite the extensive scientific evidence demonstrating that cannabis products, hemp-derived THC products, and CBD will harm elderly Americans.

108.    To date, CMS has not conducted or published any analysis of whether the products permitted under the BEI are lawful under federal law, safe for the Medicare populations at issue, or consistent with the agency's obligations under existing statutory frameworks.

109.    CMS has not addressed the cardiovascular risks documented in peer-reviewed meta-analyses, the vascular dysfunction findings involving THC edibles, the pervasive contamination and mislabeling of commercially available CBD products, the drug-interaction risks for older adults on common medications, or the near-total absence of clinical research on cannabis use in populations over 65.

27

**H.    Federal Legal Status of Cannabis Products and Hemp-Derived THC Products**

110.    Cannabis, including delta-9 THC, remains a Schedule I controlled substance under the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801–901.

111.    Hemp-derived THC products are derived by distilling delta-9 THC and other cannabinoids from hemp plants into a concentrated substance and mixing it into consumable products. As such, hemp-derived THC products contain illegal Schedule I compounds, sometimes (due to mislabeling and poor regulation) in amounts higher than the 0.3% permitted for hemp-derived products under Federal law. The hemp-derived product industry exploits this regulatory loophole for profit, to the tune of $5.5 billion. Beau R. Whitney, *An Economic Impact Analysis of the Hemp Cannabinoid Industry in Texas* (Mar. 2025), https://texashempbusinesscouncil.com/wp-content/uploads/2025/07/2024-An-Economic-Impact-Analysis-of-the-Hemp-Cannabinoid-Industry-in-Texas-Whitney-Economics-03-25-Public-Facing-1.pdf.

112.    The FDA has not approved hemp-derived THC products for medical use. Epidiolex, a CBD product that may be used to treat rare seizures associated with Lennox-Gastaut syndrome, Dravet syndrome, or tuberous sclerosis complex, has been approved by the FDA, but has not been tested for safety for people over the age of 55. *See EPIDIOLEX New Drug Application Letter*, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2018/210365orig1s000ltr.pdf.

113.    The FDA has stated that no federal regulatory framework for CBD or hemp-derived cannabis products exists.

28

114.    The FDA has identified specific safety risks associated with CBD and hemp-derived THC products, including liver injury, drug interactions, and harm to vulnerable populations, and has stated that it has "not found adequate information showing how much CBD can be consumed, and for how long, before causing harm."

115.    These FDA warnings are consistent with the peer-reviewed evidence of cardiovascular, neurological, contamination, drug-interaction, and other health risks detailed above.

## VII.  PLAINTIFFS' CLAIMS FOR RELIEF

### First Claim for Relief
### THE BEI VIOLATED THE APA'S NOTICE-AND-COMMENT REQUIREMENTS
### (Violation of 5 U.S.C. §§ 552(a)(1), 553, 706(2)(D))

116.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 115 as though fully set forth herein.

117.    The BEI constitutes a "legislative rule" in that it imposes legally binding obligations on participating organizations, creates a new benefit structure, establishes detailed eligibility criteria, requires CMS approval processes, and has "the force and effect of law." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–303 (1979)). A legislative rule is one that "effects a substantive regulatory change to the statutory or regulatory regime." *Mendoza v. Perez*, 754 F.3d 1002, 1006 (D.C. Cir. 2014) (quotation omitted).

118.    Agencies cannot "avoid notice and comment simply by mislabeling their substantive pronouncements." *See Azar v. Allina Health Services*, 587 U.S. 566, 575 (2019) (courts look to "the *contents* of the agency's action, not the agency's self-serving *label*,

29

when deciding whether statutory notice-and-comment demands apply" (emphasis in original)).

119.   "[A]ny contract provisions that are legislative [in character] are subject to § 553's notice and comment requirements." *American Hospital Ass'n v. Bowen*, 834 F.2d 1037, 1054 (D.C. Cir. 1987). CMS "may not hide behind its authority to contract in order to evade the APA." *Id.* (quoting district court).

120.   No exception to the APA's notice-and-comment requirement applies. The BEI is not an interpretive rule because it does not merely clarify an existing statute or regulation. Rather, the BEI creates entirely new programmatic requirements. *See Tennessee v. Dep't of Educ.*, 104 F.4th 577, 608 (6th Cir. 2024) (legislative rules have "the force and effect of law" and are "subject to notice and comment"). The BEI is not a general statement of policy because it has binding effect through mandatory implementation mechanics on participating providers. And it is not a rule of agency organization, procedure, or practice because it directly affects the rights and obligations of participating organizations and Medicare beneficiaries.

121.   Section 1115A does not expressly exempt CMS from APA rulemaking requirements. Under 5 U.S.C. § 559, a subsequent statute supersedes the APA's rulemaking provisions only if it "does so expressly." An exemption is express only when Congress "has established procedures so clearly different from those required by the APA that it must have intended to displace the norm." *Asiana Airlines v. FAA*, 134 F.3d 393, 397 (D.C. Cir. 1998). Section 1115A contains no such express exemption.

122.    CMS adopted and published a generally applicable policy with legal effect without the Federal Register publication required for substantive rules under the APA and the Federal Register Act, 44 U.S.C. § 1505. The failure to publish in the Federal Register independently violates 5 U.S.C. § 552(a)(1). *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020 (D.C. Cir. 2000) (an agency "can inform those affected simply by posting its new guidance or memoranda or policy statement on its web site," but this does not satisfy statutory publication requirements for substantive rules).

123.    The precedent from CMS's own prior use of Section 1115A authority is instructive. When CMS issued an Interim Final Rule implementing Most Favored Nation ("MFN") drug pricing using Section 1115A authority without notice-and-comment, multiple federal courts enjoined the rule for failing to satisfy the good-cause exception. *See Regeneron Pharms.*, 510 F. Supp. 3d at 29. The same principle applies here: CMS cannot use Section 1115A to avoid the APA's core procedural protections simply by embedding a policy change in a participation agreement rather than a formal rule.

124.    The BEI was adopted and published without observance of procedure required by law, in violation of 5 U.S.C. § 706(2)(D).

**Second Claim for Relief**
**THE BEI IS ARBITRARY AND CAPRICIOUS**
**(Violation of 5 U.S.C. § 706(2)(A))**

125.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 124 as though fully set forth herein.

126.    The BEI is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

127.    First, CMS's decision to allow access to cannabis- and hemp-derived products to Medicare recipients, without analysis or explanation, differs from its approach in a final rule issued only one year ago that cannabis- and hemp-derived products were ineligible for Medicare coverage. CMS has also provided no explanation for its sudden decision to allow access to substances it previously affirmed, in its published April 2025 rule, were illegal under federal law. When an agency changes course, it must provide "a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009)). An "unexplained inconsistency" renders a changed policy arbitrary and capricious. *Children's Hospital Ass'n of Texas v. Azar*, 933 F.3d 764, 773 (D.C. Cir. 2019). CMS quietly inserted the BEI into participation agreements without any explanation for why the prior position is no longer appropriate and has not, to date, provided any analysis for its action.

128.    Second, CMS entirely failed to consider important hazards that arise from this policy reversal. The agency did not address:

a.      the federal legal status of the products under the CSA;

b.      the substantial and growing peer-reviewed evidence of adverse health outcomes or risks associated with the use of cannabis- and hemp-derived THC products by an aging and vulnerable population, namely the risk of cardiovascular harm, liver injury, dangerous drug interactions with

medications commonly used by older adults, cognitive harms risk, and pervasive contamination and mislabeling;

c.   the absence of an FDA regulatory framework for CBD;

d.   the near-total absence of clinical research on cannabis use in populations over 65; or

e.   the conflict with the FY2026 Agriculture Appropriations Act's THC limits.

Each of these failures independently renders the BEI arbitrary and capricious. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem").

129.   Third, CMS's THC limit of 3 mg per serving directly conflicts with the 2026 Agriculture Appropriations Act's limit of 0.4 mg per container, effective November 2026. CMS's admission that it "will adjust its definition in accordance with the law" is itself an acknowledgment that the current program conflicts with enacted and unambiguous federal law. A deliberate decision to launch a program that the agency already knows will be inconsistent with federal law is arbitrary agency action.

130.   Fourth, CMS has not demonstrated that the BEI satisfies the statutory prerequisites of Section 1115A, which limits testing to models for "defined populations with deficits in care leading to poor clinical outcomes or potentially avoidable expenditures." 42 U.S.C. § 1315a(a)(1). The BEI is available to any aligned beneficiary over age 18 without a disqualifying condition. Far from targeting a defined population or reasonably limiting eligibility based on statutory criteria, the model's scope effectively encompasses nearly all Medicare beneficiaries, regardless of clinical outcomes or

incurred expenditures, so long as they are aligned with an ACO REACH, EOM, or LEAD participating provider.

131.    Accordingly, the BEI is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### Third Claim for Relief
### THE BEI EXCEEDS CMS'S STATUTORY AUTHORITY
### AND VIOLATES THE MAJOR QUESTIONS DOCTRINE
### (Violation of 5 U.S.C. § 706(2)(C))

132.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 131 as though fully set forth herein.

133.    Under *West Virginia v. EPA*, 597 U.S. 697 (2022), in "extraordinary cases" where an agency asserts authority of vast economic and political significance, "the agency . . . must point to 'clear congressional authorization' for the power it claims." *Id.* at 723 (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)). The major questions doctrine applies when the agency's action is "unheralded" and represents a "transformative expansion" of its authority under vague statutory language, and the regulation is of "vast economic and political significance." *Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024).

134.    CMS has acted in excess of its statutory authority under Section 1115A by creating—for the first time in history—federally sanctioned access to cannabis products and hemp-derived THC products through Innovation Center program amendments, without APA rulemaking, without clear congressional authorization, and in violation of federal law.

135. No Innovation Center precedent exists for distributing specific consumer products to beneficiaries. Innovation Center models are used to test payment methods, not to increase access to unapproved drugs.

136. Congress never authorized CMS to use the Innovation Center to facilitate access to products containing substances listed as Schedule I under the CSA.

137. The political and policy significance of the program, as evidenced by Administrator Oz's public statements and the Executive Order that preceded it, is considerable.

138. The BEI's potential reach across multiple models covering substantial Medicare populations, the unprecedented nature of CMS facilitating access to any specific consumer product, and the absence of any prior Innovation Center precedent for distributing specific products to beneficiaries all confirm that this is an extraordinary assertion of authority requiring clear congressional authorization. *See Missouri v. Biden*, 112 F.4th 531, 537 (8th Cir. 2024) (applying the major questions doctrine where the government asserted "an unheralded power to regulate a significant portion of the American economy" under a long-extant statute (quoting *Util Air Regul. Grp.*, 573 U.S. at 324)).

139. Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the court must exercise independent judgment and not merely defer to CMS's assertion that its action falls within Section 1115A authority.

140. The BEI exceeds CMS's statutory jurisdiction, authority, or limitations, in violation of 5 U.S.C. § 706(2)(C).

**Fourth Claim for Relief**
**THE BEI IS NOT IN ACCORDANCE WITH LAW**
**(Violation of 5 U.S.C. § 706(2)(A))**

141.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 140 as though fully set forth herein.

142.    The BEI is "not in accordance with law" because it conflicts with controlling federal statutes.

143.    The BEI's THC limits conflict with the 2026 Agriculture Appropriations Act, which sets a total THC limit of 0.4 mg per container for hemp-derived products, effective November 2026.

144.    The BEI conflicts with the Controlled Substances Act. It facilitates access to products that contain substances illegal under the CSA, including cannabis, delta-9 THC, and other cannabinoids.

145.    The FDA has only approved Epidiolex, a CBD medication, but has not approved any other hemp-derived THC products for medical use and has identified specific safety risks including liver injury, drug interactions, and other harms.

146.    CMS did not conduct or publish any compliance analysis for the BEI before creating and authorizing it.

**VIII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

a.      A declaration that the BEI was adopted and published in violation of the APA's notice-and-comment requirements, 5 U.S.C. § 553, and the Federal Register publication requirements of 5 U.S.C. § 552(a)(1);

b.      A declaration that the BEI is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A);

c.      A declaration that the BEI exceeds CMS's statutory authority under Section 1115A and is in excess of statutory jurisdiction, authority, or limitations under 5 U.S.C. § 706(2)(C);

d.      An order vacating and setting aside the BEI;

e.      A permanent injunction prohibiting Defendants from implementing, applying, or enforcing the BEI;

f.      An award of costs and attorneys' fees as permitted by law; and

g.      Such other and further relief as the Court deems just and proper.

Date: March 30, 2026

Respectfully submitted,

*/s/ Patrick Kenneally*

Patrick Kenneally*
    IL Bar #6286573
Connor W. Mighell
    TX Bar #24110107
    D.D.C. Bar ID #TX0032
**BURKE LAW GROUP, PLLC**
1000 Main Street, Suite 2300
Houston, Texas 77002
Telephone: (832) 987-2214
Fax: (832) 793-0045
patrick.kenneally@burkegroup.law
connor.mighell@burkegroup.law
*Admission Pro Hac Vice Pending*

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that, on March 30, 2026, I electronically filed the foregoing Complaint for Declaratory and Injunctive Relief, Corporate Disclosure Statement, and this Certificate of Service with the Clerk of Court for the United States District Court for the District of Columbia by using the CM/ECF system. In accordance with Fed. R. Civ. P. 4, I am causing to be served one true and correct copy of the filed documents via certified mail, along with a summons, on each of the following persons:

ROBERT F. KENNEDY, JR.
in his official capacity as Secretary of Health
and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201

THE UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Avenue, S.W.
Washington, DC 20201

MEHMET OZ, M.D.
in his official capacity as Administrator of
the Centers for Medicare & Medicaid
Services
7500 Security Boulevard
Baltimore, MD 21244-1850

THE CENTERS FOR MEDICARE &
MEDICAID SERVICES
7500 Security Boulevard
Baltimore, MD 21244-1850

JEANINE FERRIS PIRRO
in her official capacity as U.S. Attorney for
the District of Columbia
601 D Street, N.W.
Washington, DC 20579

PAMELA BONDI
in her official capacity as Attorney General
of the United States
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

/s/ Patrick Kenneally
Patrick Kenneally