IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SMART APPROACHES TO MARIJUANA, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, *et al.*,<br><br>    *Defendants.* | Case No. 1:26-cv-01081-TNM |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND STAY OF AGENCY ACTION PENDING JUDICIAL REVIEW**

**TABLE OF CONTENTS**

I.      INTRODUCTION...........................................................................................................1

II.     STATEMENT OF FACTS ............................................................................................ 2

    A.   The CMS Innovation Center and Section 1115A Authority...................................... 2

    B.   The BEI's Structure and Terms ................................................................................ 4

    C.   CMS's Prior Position on Cannabis Products............................................................. 5

    D.   Executive Order No. 14370 ...................................................................................... 5

    E.   Absence of Notice-and-Comment Rulemaking.......................................................... 6

    F.   Conflict with the FY2026 Agriculture Appropriations Act and Controlled Substances Act ........................................................................................................ 7

    G.   CMS's Contract Year 2027 Rule ............................................................................. 8

    H.   MMJ's Regulatory Background ................................................................................ 8

    I.   The Health Risks CMS Failed to Consider .............................................................. 9

III.    LEGAL STANDARD.................................................................................................. 11

IV.     ARGUMENT .............................................................................................................. 12

    A.   This Challenge Is Reviewable ................................................................................ 12

    B.   The Benefits Exception to Notice-and-Comment Does Not Apply ......................... 13

    C.   Plaintiffs Have Standing ........................................................................................ 14

        a. Competitor Standing. ......................................................................................... 14

        b. Organizational Standing. ................................................................................... 16

        c. Procedural Standing. .......................................................................................... 17

        d. Individual and Associational Standing. ............................................................. 19

    D.   Plaintiffs Are Likely To Succeed on the Merits ..................................................... 21

        a. CMS violated the APA's notice-and-comment requirements. ............................ 21

        b. The BEI is arbitrary, capricious, and not reasonably explained.......................... 23

        c. The BEI exceeds CMS's statutory authority....................................................... 25

        d. The BEI conflicts with federal law...................................................................... 27

        e. The BEI violates equal protection. ...................................................................... 28

        f. The BEI violates due process. ............................................................................. 29

    E.   Plaintiffs Will Suffer Irreparable Harm Absent Relief............................................ 30

    F.   The Balance of the Equities and Public Interest Favor Relief ................................. 32

G.  The Court Should Issue Relief Under Rule 65 and 5 U.S.C. § 705 ........................... 33

**V.   CONCLUSION ................................................................................................................... 34**

# TABLE OF AUTHORITIES

**CASES**

*Air Excursions LLC v. Yellen*, 66 F.4th 272 (D.C. Cir. 2023) ...................................................... 14

*American Hospital Ass'n v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987) ................................... 22, 23

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) .............................................. 23

*Asiana Airlines v. FAA*, 134 F.3d 393 (D.C. Cir. 1998) ............................................................. 23

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150 (1970) ............................... 19

*Azar v. Allina Health Servs.*, 587 U.S. 566 (2019) ..................................................................... 22

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................................. 12, 13

*Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986) .................................. 12

*Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) ...................... 17

*Children's Hosp. Ass'n of Texas v. Azar*, 933 F.3d 764 (D.C. Cir. 2019) ................................... 23

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ......................................................................... 21

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) .................................................... 23, 24

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ......................................................... 23

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ........................................................... 23

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ............................................... 15

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ......................................................... 17, 21

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977) ............................. 21

*Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972 (9th Cir. 2025) .............................................. 11

*KERM, Inc. v. FCC*, 353 F.3d 57 (D.C. Cir. 2004) .................................................................... 14

*La. Energy & Power Auth. v. FERC*, 141 F.3d 364 (D.C. Cir. 1998) ........................................ 14

*League of Women Voters of the United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............. 33

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................................. 19

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .............................................................................. 18

iv

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ......................................................... 17, 18, 22

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29 (1983) ........................................ 24

*Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30 (D.D.C. 2000)............................................. 30

Nat'l Ass'n of Clean Water Agencies v. EPA, 734 F.3d 1115, 1148 (D.C. Cir. 2013) .............. 13

*Nat'l Treasury Emps. Union v. Newman*, 768 F. Supp. 8 (D.D.C. 1991) ................................. 31

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................................... 11, 32

*PDK Labs., Inc. v. DEA*, 362 F.3d 786 (D.C. Cir. 2004) ........................................................ 27

*People for the Ethical Treatment of Animals v. United States Dep't of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015) ......................................................................................................... 17

*Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92 (2015).................................................................. 21

*Regeneron Pharms., Inc. v. United States HHS*, 510 F. Supp. 3d 29 (S.D.N.Y. 2020) ............ 12

*Sackett v. EPA*, 566 U.S. 120 (2012) ........................................................................................ 13

*Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010) .................................................................... 14, 15

*Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002) ....... 18, 19, 31, 33

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)...................................................................... 18

*United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001) ................................... 34

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) ................................................................ 29

*West Virginia v. EPA*, 597 U.S. 697 (2022)........................................................................... 25, 27

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)...................................................... 11

**CONSTITUTIONAL PROVISIONS & STATUTES**

21 U.S.C. § 802 ............................................................................................................................. 7

21 U.S.C. §§ 801-901 ................................................................................................................... 7

42 U.S.C. § 1315 ...................................................................................................................... 2, 12

44 U.S.C. § 1505 ......................................................................................................................... 23

5 U.S.C. § 552 ............................................................................................................................. 23

5 U.S.C. § 553 ............................................................................................................ 13, 17, 22

5 U.S.C. § 559 ...................................................................................................................... 23

5 U.S.C. § 705 ............................................................................................................. 2, 11, 34

5 U.S.C. § 706 .................................................................................................................. 23, 27

7 U.S.C. § 1639o .................................................................................................................. 5, 7

## OTHER AUTHORITIES

Abra M. Jeffers et al., *Association of Cannabis Use with Cardiovascular Outcomes Among US Adults*, 13 J. Am. Heart Ass'n e030178 (2024).................................................................... 10

Cong. Rsch. Serv., Changes to the Federal Definition of Hemp: Legal Background and Pending Legislation, LSB11381 (Dec. 22, 2025).................................................................... 5

*Consumer Updates*, Fed. Drug Admin. (Mar. 5, 2020), https://www.fda.gov/consumers/consumer-updates/what-you-need-know-and-what-were-working-find-out-about-products-containing-cannabis-or-cannabis........ 27

*Drug Scheduling*, U.S. DRUG ENF'T ADMIN., https://www.dea.gov/drug-scheduling ...... 7

*EPIDIOLEX New Drug Application Letter*, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2018/210365orig1s000 ltr.pdf .................................................................................................................................. 11

*Excerpts From President Trump's Historic Executive Order*, Cannabis Indus. J. (Dec. 18, 2025), https://cannabisindustryjournal.com/news_article/excerpts-from-president-trumps-historic-executive-order/ ........................................................................................ 6

Hannah Gardener et al., *Heavy Metal and Phthalate Contamination and Labeling Integrity in a Large Sample of US Commercially Available Cannabidiol (CBD) Products*, 851 Sci. Total Env't 158110 (2022) ............................................................................................................ 10

*HFP Constituent Updates*, U.S. Food & Drug Admin. (Nov. 21, 2022), https://www.fda.gov/food/hfp-constituent-updates/fda-warns-companies-illegally-selling-food-and-beverage-products-contain-cbd ............................................. 11

*Innovation Models: ACO REACH*, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/priorities/innovation/innovation-models/aco-reach ............ 3

*Innovation Models: EOM*, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/priorities/innovation/innovation-models/eom...................... 3

Kyle Jaeger, *Federal Agency Finalized Rule for CBD Medicare Coverage Pilot Program Weeks Ago, Key Hemp Stakeholder Says*, Marijuana Moment (Feb. 13, 2026), https://www.marijuanamoment.net/federal-agency-finalized-rule-for-cbd-medicare-coverage-pilot-program-weeks-ago-key-hemp-stakeholder-says/ ................ 6

*LEAD (Long-Term Enhanced ACO Design) Model*, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/priorities/innovation/innovation-models/lead ..................... 4

Leila Mohammadi et al., *Association of Endothelial Dysfunction with Chronic Marijuana Smoking and THC-Edible Use*, JAMA Cardiology (May 28, 2025) ................................... 10

*Public Health Focus*, Fed. Drug Admin. (July 16, 2024), https://www.fda.gov/news-events/public-health-focus/fda-regulation-cannabis-and-cannabis-derived-products-including-cannabidiol-cbd ................................................................................. 27

*Substance Access: Beneficiary Engagement Incentive*, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/priorities/innovation/substance-access-beneficiary-engagement-incentive ....................................................................... 4, 5

Wilhelm Storck et al., *Cardiovascular Risk Associated with the Use of Cannabis and Cannabinoids: A Systematic Review and Meta-Analysis*, 111 Heart 1047 (2025) .................. 9

**RULES**

Federal Rule of Civil Procedure 65 ........................................................................... 2

**REGULATIONS**

90 Fed. Reg. 15,792, 15,867 (Apr. 15, 2025) ................................................................. 1, 5

90 Fed. Reg. 60,541 (Dec. 23, 2025) .......................................................................... 5

91 Fed. Reg. 17,384 ............................................................................................. 8, 25

## I.   INTRODUCTION

On March 20, 2026, the Centers for Medicare & Medicaid Services ("CMS") announced the Substance Access Beneficiary Engagement Incentive ("BEI"). The BEI is a program to distribute hemp-derived products containing the Schedule I substance delta-9 tetrahydrocannabinol ("THC") and other cannabinoids to Medicare beneficiaries through participating health care organizations. It took effect on April 1, 2026 and is available to Medicare patients participating in Medicare Innovation Center models ACO REACH, the Enhancing Oncology Model ("EOM"), and, on January 1, 2027, the Long-term Enhanced ACO Design Model ("LEAD").

CMS published no Notice of Proposed Rulemaking. It solicited no public comments. It offered no reasoned explanation. It bypassed the Federal Register entirely. It effectively reversed, *sub silentio*, its own April 2025 final rule declaring cannabis products ineligible for supplemental Medicare coverage. 90 Fed. Reg. 15,792, 15,867 (Apr. 15, 2025). On top of those Administrative Procedure Act ("APA") violations, CMS allowed certain hemp and cannabinoid industry stakeholders notice and input into the rulemaking process while providing none to others, violating the equal-protection and procedural-due-process guarantees of the Fifth Amendment's Due Process Clause.

CMS coopted Section 1115A, a statutory vehicle Congress created to test payment and healthcare delivery models, to make THC products available by fiat to millions of Medicare beneficiaries. It did so without any congressional authorization, lacking the procedural safeguards Congress mandated, and devoid of any analysis of whether these products are legal or safe for the elderly Americans who will receive them. This is

1

precisely the kind of agency overreach that the major questions doctrine prohibits and that the APA was designed to prevent.

Plaintiffs respectfully request that this Court: (1) issue a preliminary injunction under Federal Rule of Civil Procedure 65(a); and (2) stay the effective date of the BEI pending judicial review under 5 U.S.C. § 705. Plaintiffs further request an expedited briefing and hearing schedule on this matter. The BEI has now gone into effect, and its harms to Plaintiffs are ongoing. It must be halted until CMS complies with the law.

## II.    STATEMENT OF FACTS

Plaintiffs incorporate by reference the Statement of Facts set forth in the First Amended Complaint and set forth herein the following facts most relevant to preliminary and interim relief.

### A.    The CMS Innovation Center and Section 1115A Authority

Section 1115A of the Social Security Act, 42 U.S.C. § 1315a, established the Center for Medicare & Medicaid Innovation within CMS. Its statutory purpose is to test "innovative payment and service delivery models" to reduce program expenditures "while preserving or enhancing the quality of care" for "defined populations with deficits in care leading to poor clinical outcomes or potentially avoidable expenditures." 42 U.S.C. § 1315a(a)(1). It was not designed to create access to over-the-counter consumer products with highly questionable medical applications. The models at issue, ACO REACH and EOM, are payment and delivery models.

The ACO Reach brings together doctors, hospitals, and other healthcare providers into a single team called an Accountable Care Organization ("ACO"). *See Innovation Models:   ACO   REACH*,   Ctrs.   for   Medicare   &   Medicaid   Servs.,

2

https://www.cms.gov/priorities/innovation/innovation-models/aco-reach.    These teams coordinate patient care, ensuring patients get the right tests, follow-up, and preventative services to reduce duplication or unnecessary medical procedures. *Id.* If the ACO keeps costs below a benchmark while meeting quality standards, the team shares in the savings, thereby encouraging providers to work together efficiently to focus on preventive care, chronic disease management, and patient outcomes rather than simply the number of services delivered. *Id.* Currently, there are approximately 74 ACOs made up of approximately 126,000 providers and organizations providing care to approximately 1.7 million Medicare beneficiaries. *Id.*

The EOM focuses on Medicare patients with certain cancers and tests a new way of paying oncology practices. *See Innovation Models: EOM*, Ctrs. for Medicare & Medicaid Servs.,    https://www.cms.gov/priorities/innovation/innovation-models/eom. Participating clinics are given bundled payments or target budgets for patients' entire course of cancer treatment, rather than being paid separately for every test or procedure. *Id.* The incentive is that if the clinic keeps costs within the target and meets quality and outcome goals, it can earn shared savings bonuses. *Id.* Based on the most recent publicly available information, the total number of Medicare participants is unknown. *Id.* However, 28 physician group practices and one commercial payer are participating, accounting for approximately 2,000 practitioners across more than 350 care sites. *Id.*

The BEI also applies to another payment model, LEAD, which does not begin until January 1, 2027. *See LEAD (Long-Term Enhanced ACO Design) Model*, Ctrs. for Medicare &

Medicaid      Servs.,      https://www.cms.gov/priorities/innovation/innovation-models/lead.

### B.   The BEI's Structure and Terms

CMS published the BEI on its website on March 20, 2026, and nowhere else. *See Substance Access Beneficiary Engagement Incentive*, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/priorities/innovation/substance-access-beneficiary-engagement-incentive. The BEI is incorporated into the participation agreements governing ACO REACH and EOM and becomes effective on April 1, 2026. *Id.* By its terms, ACO REACH and EOM providers can offer eligible "hemp" products to patients. *Id.* To be eligible, products must be taken orally and contain no more than 0.3% delta-9 THC by weight and no more than 3 mg of total tetrahydrocannabinols per serving, including delta-8, delta-10, and THCA. *Id.* Depending on the serving size, the product could contain up to 3 mg of delta-9 THC per serving, as long as the 0.3% by weight limit is not exceeded. *Id.* Other program requirements include: (a) formal election of the BEI by the participating ACO or EOM; (b) submission of a CMS-required Implementation Plan by the participating ACO or EOM; (c) CMS approval of that plan, with CMS retaining authority to reject or suspend participation; (d) physician determination of beneficiary eligibility, including that the beneficiary is over 18 years of age and does not have a disqualifying condition, although CMS has not publicly specified those conditions that are disqualifying; (e) shared decision-making with beneficiaries; (f) product eligibility and dosing requirements; (g) a $500 annual cap per beneficiary; and (h) quarterly

reporting obligations. *Id.* CMS claims Medicare does not pay for the products directly, but the limited information available makes it unclear whether this is true.

### C.    CMS's Prior Position on Cannabis Products

In April 2025, only one year earlier, CMS took the near inverse position to the one it now maintains. Specifically, after notice-and-comment rulemaking and in full compliance with the APA, CMS issued a final rule, effective June 3, 2025, stating that "medical marijuana or derivatives, such as cannabis oil, cannot be covered by [Medicare Advantage] organizations as they are illegal substances under Federal law." 90 Fed. Reg. 15,792, 15,867 (Apr. 15, 2025). CMS has not rescinded this rule. Moreover, CMS found that "cannabis" products "do not have a reasonable expectation of improving or maintaining the health of the chronically ill." *Id.* "Hemp" and "marijuana" are both forms of cannabis, come from the *Cannabis sativa L.* plant, and share the same chemical constituents; the sole difference between them is the concentration of delta-9 THC, discussed further below. *See also* Agriculture Improvement Act of 2018 ("2018 Farm Bill"), Pub. L. No. 115-334, § 10113, 132 Stat. 4490, 4908 (codified at 7 U.S.C. § 1639o); *see generally* Cong. Rsch. Serv., Changes to the Federal Definition of Hemp: Legal Background and Pending Legislation, LSB11381 (Dec. 22, 2025). The 2018 Farm Bill excluded hemp from the CSA's definition of marijuana but did not establish a federal regulatory framework for hemp-derived consumer products.

### D.    Executive Order No. 14370

On December 18, 2025, President Trump signed Executive Order No. 14370, titled "Increasing Medical Marijuana and Cannabidiol Research." 90 Fed. Reg. 60,541 (Dec. 23, 2025). At the signing ceremony, CMS Administrator Dr. Mehmet Oz publicly stated that

"millions of Americans on Medicare" would become eligible to receive cannabis and hemp-derived products "as early as April of next year, and at no charge, if their doctors recommend them." *Excerpts From President Trump's Historic Executive Order*, Cannabis Indus. J. (Dec. 18, 2025), https://cannabisindustryjournal.com/news_article/excerpts-from-president-trumps-historic-executive-order/. This announcement predated the BEI by three months and signaled a predetermined outcome.

Charlotte's Web, a major hemp company, collaborated with CMS in shaping the BEI. Charlotte's Web co-founder Jared Stanley confirmed in February 2026 that the BEI program was "internally finalized" by CMS weeks before publication and referred to a "briefing" that he and other hemp industry insiders had received weeks prior. Kyle Jaeger, *Federal Agency Finalized Rule for CBD Medicare Coverage Pilot Program Weeks Ago, Key Hemp Stakeholder Says*, Marijuana Moment (Feb. 13, 2026), https://www.marijuanamoment.net/federal-agency-finalized-rule-for-cbd-medicare-coverage-pilot-program-weeks-ago-key-hemp-stakeholder-says/.

### E.    Absence of Notice-and-Comment Rulemaking

CMS issued no Notice of Proposed Rulemaking. It solicited no public comments. It provided no formal administrative record. It offered no reasoned explanation for creating the BEI or for reversing its April 2025 final rule. The BEI was not published in the Federal Register. It was announced on March 20, 2026 with a rushed effective date of April 1, 2026, only 11 days later.

**F.    Conflict with the FY2026 Agriculture Appropriations Act and Controlled Substances Act**

The U.S. Drug Enforcement Administration (DEA) currently classifies marijuana as a Schedule I controlled substance. *Drug Scheduling*, U.S. DRUG ENF'T ADMIN., https://www.dea.gov/drug-scheduling. That means that sale and possession of marijuana and all derivatives is illegal under federal law. 21 U.S.C. §§ 801–901.

The Controlled Substances Act ("CSA") defines "marijuana" as "all parts of the plant *Cannabis sativa L.*, whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin." 21 U.S.C. § 802(16)(A).

The 2018 Farm Bill amended the definition of "marijuana" to exclude "hemp." *See* Pub. L. No. 115-334, § 12619, 132 Stat. 4490, 5018 (2018). The bill defined "hemp" as "[t]he plant *Cannabis sativa L.* and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."

The FY2026 Agriculture Appropriations Act ("2026 Agriculture Appropriations Act"), signed by President Trump just this past February, further clarified statutory limits on hemp-derived products by establishing a total THC limit of 0.4 mg per container, effective November 2026. This represents a substantive change from the 2018 Farm Bill, which regulated hemp based on the percentage of delta-9 THC by dry weight rather than total THC per container.

7

### G.   CMS's Contract Year 2027 Rule

On April 6, 2026, CMS published the Contract Year 2027 final rule in the Federal Register after full notice-and-comment rulemaking, receiving approximately 42,632 comments. *See* 91 Fed. Reg. 17,384 (Apr. 6, 2026) ("CY2027 Rule"). In that rule, CMS acknowledged that it "does not regulate cannabis and hemp-derived cannabis products" and that its "authority does not extend to the direct regulation of cannabis-derived products." *Id.* at 17,432–17,433. CMS further stated that "any changes to SSBCI requirements will be made by requesting public comment on a proposed regulation through a Notice of Proposed Rulemaking." *Id.* at 17,433. The CY2027 Rule confirmed that the only cannabis-derived products currently permissible under applicable federal law are hulled hemp seed, hemp seed protein powder, and hemp seed oil—basic food-grade ingredients, not the variety of hemp-derived THC and CBD products that the BEI authorizes for distribution. *Id.* at 17,432.

### H.   MMJ's Regulatory Background

Plaintiff MMJ International Holdings, Inc. ("MMJIH") is a Delaware-incorporated life sciences company established to develop pharmaceutical cannabinoid therapeutics under the FDA's botanical drug development framework. Ex. H ¶ 4 (Boise Decl.). Over approximately eight years, MMJIH and its subsidiary Plaintiffs MMJ BioPharma Cultivation, Inc. ("MMJBC") and MMJ BioPharma Labs, Inc. ("MMJBL") have invested over $10 million into advancing pharmaceutical cannabinoid therapeutics through the formal federal FDA botanical drug development pathway and the DEA controlled-substance registration framework. Ex. H ¶¶ 27–28, 43. These investments include: IND submissions and regulatory engagement with the FDA; Orphan Drug Designation for

8

Δ9-tetrahydrocannabinol and cannabidiol for the treatment of Huntington's disease (IND file number 137754); a pending bulk manufacturing application before the DEA; formulation development and stability studies conducted with Catalent Pharma Solutions; analytical testing and chromatographic characterization by Avanti Rx Analytics Inc.; regulatory consulting engagements; and a proposed capital raise of approximately $45 million in debt and equity securities. Ex. H ¶¶ 20–28.

MMJBC submitted a DEA application for registration as a bulk manufacturer of marijuana active pharmaceutical ingredient in December 2018. Ex. H ¶¶ 6, 13. The DEA conducted pre-registration investigations and site visits in 2021 and 2022, and MMJBC's application remains pending before the DEA Administrator for final determination. Ex. H ¶¶ 14–19. MMJBL holds an active DEA Schedule I analytical laboratory registration. Ex. H ¶¶ 8, 12.

## I. The Health Risks CMS Failed to Consider

As discussed in detail in the First Amended Complaint, the scientific evidence documenting health risks from cannabis and hemp-derived THC products for older adults is substantial. Representative studies include:

- A June 2025 meta-analysis published in *Heart*, encompassing 24 studies and approximately 200 million participants, found that cannabis use was associated with a two-fold risk of cardiovascular death, a 29% higher risk of acute coronary syndrome, and a 20% higher risk of stroke. *See* Wilhelm Storck et al., *Cardiovascular Risk Associated with the Use of Cannabis and Cannabinoids: A Systematic Review and Meta-Analysis*, 111 Heart 1047 (2025).

- A 2024 study in the *Journal of the American Heart Association*, analyzing data from approximately 434,000 U.S. adults, found that daily cannabis users had a 25% higher risk of heart attack and a 42% higher risk of stroke. *See* Abra M. Jeffers et al., *Association of Cannabis Use with Cardiovascular Outcomes Among US Adults*, 13 J. Am. Heart Ass'n e030178 (2024).

- A May 2025 study in *JAMA Cardiology* found that chronic cannabis use, whether smoked or consumed as THC-containing edibles, was associated with vascular endothelial dysfunction comparable to that observed in tobacco smokers. *See* Leila Mohammadi et al., *Association of Endothelial Dysfunction with Chronic Marijuana Smoking and THC-Edible Use*, JAMA Cardiology (May 28, 2025).

- A peer-reviewed 2022 study analyzing 516 U.S. CBD products found that only 42% fell within ±10% of the CBD content claimed on the label. Among 121 edible CBD products tested, lead was detected in 42%, mercury in 37%, and arsenic in 28%. *See* Hannah Gardener et al., *Heavy Metal and Phthalate Contamination and Labeling Integrity in a Large Sample of US Commercially Available Cannabidiol (CBD) Products*, 851 Sci. Total Env't 158110 (2022).

The FDA has not approved hemp-derived THC products for medical use. While Epidiolex, a CBD product used to treat rare seizures, has been approved by the FDA, it has not been tested for safety in people over 55. *See EPIDIOLEX New Drug Application Letter*,

https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2018/210365orig1s000ltr

10

.pdf. The FDA has stated that no federal regulatory framework for CBD exists and that it has "not found adequate information showing how much CBD can be consumed, and for how long, before causing harm." *HFP Constituent Updates*, U.S. Food & Drug Admin. (Nov. 21, 2022), https://www.fda.gov/food/hfp-constituent-updates/fda-warns-companies-illegally-selling-food-and-beverage-products-contain-cbd. Lastly, neither the FDA nor the BEI imposes any meaningful safeguards to prevent product adulteration, ensure quality control, or require independent testing.

## III.   LEGAL STANDARD

A plaintiff seeking a preliminary injunction must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Section 705 of the APA provides that "on such conditions as may be required and to the extent necessary to prevent irreparable injury," a reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The factors for granting a stay under Section 705 "substantially overlap with the *Winter* factors." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 986 (9th Cir. 2025) (cleaned up). Moreover, where (as here) the government is a party, the third and fourth factors, balance of equities and public interest, merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## IV.   ARGUMENT

### A.   This Challenge Is Reviewable

Section 1115A of the Social Security Act bars judicial review of certain Innovation Center decisions, including "selection of models for testing," "selection of organizations, sites, or participants," and "the elements, parameters, scope, and duration" of models. 42 U.S.C. § 1315a(d)(2). Plaintiffs do not challenge these decisions. Rather, they fault CMS for its decision to adopt a binding rule of general applicability—imposing eligibility criteria, reporting requirements, product specifications, and implementation plan mandates on participating organizations—without complying with the APA's procedural requirements, in excess of its statutory authority, and in violation of the Constitution. As such, this suit is reviewable. *See Regeneron Pharms., Inc. v. United States HHS*, 510 F. Supp. 3d 29, 42 (S.D.N.Y. 2020) (holding that Section 1115A "does not bar review of the propriety of the procedures used" to establish models). Moreover, there is a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670–71 (1986) (finding presumption may only be overcome by "clear and convincing evidence" of congressional intent to preclude review).

Additionally, the BEI is final agency action. It marks the consummation of CMS's decision-making process, it has been published, it has a fixed implementation date, and is not tentative or interlocutory. Second, it is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). The BEI's binding requirements on all participating organizations produce concrete legal consequences for their aligned Medicare

12

beneficiaries. *See Sackett v. EPA*, 566 U.S. 120, 127 (2012) (agency action is final where it determines rights or obligations and produces direct legal consequences); *see also Bennett*, 520 U.S. at 178.

### B.   The Benefits Exception to Notice-and-Comment Does Not Apply

The BEI is not a benefits determination. CMS itself asserts that the BEI does not involve Medicare paying for products. No new entitlement is created. No Medicare claim is submitted. Instead, the BEI imposes a binding regulatory framework on participating providers that governs what products they may distribute, how they must screen patients, what implementation plains they must submit for CMS approval, and what reports they must file. Such a framework is not a benefit within the meaning of 5 U.S.C. § 553(a)(2), and is not exempt from notice or comment.

Moreover, the BEI is unprecedented. It distributes consumer products containing Schedule I substances through a new regulatory framework that has no precedent in Medicare history. CMS cannot be allowed to do anything they wish through Medicare participation agreements. The notice-and-comment process "ensures that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is likely to give real consideration to alternative ideas." *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1148 (D.C. Cir. 2013). Reading 5 U.S.C. § 553(a)(2) to exempt the BEI from notice-and-comment would eviscerate those protections precisely when they are most needed: when CMS is adopting an unprecedented program implicating public health, federal drug law, and healthcare policy.

13

## C.   Plaintiffs Have Standing

Plaintiffs attach several declarations establishing their standing to bring this lawsuit. *See* Exs. A–H. Plaintiffs have standing on four independent bases.

### a.   Competitor Standing.

The D.C. Circuit's competitor standing doctrine provides that "parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010) (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)). To invoke competitor standing, a plaintiff must show that the challenged government action results in "an actual or imminent increase in competition" and that the plaintiff is "a direct and current competitor" whose "bottom line may be adversely affected by the challenged government action." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 280 (D.C. Cir. 2023) (quoting *KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004)).

The MMJ Plaintiffs satisfy each element. *See* Ex. H (Boise Decl.). First, the BEI creates a federally supported pathway for non-FDA-approved cannabinoid products to reach Medicare beneficiaries—the very patient population the MMJ Plaintiffs' FDA-validated therapies are designed to serve. Before the BEI, there was no federal reimbursement pathway for non-FDA-approved cannabinoid products in Medicare. The BEI created one. Ex. H ¶ 67. The MMJ Plaintiffs compete in the cannabinoid therapeutics market for Medicare-eligible patient populations. The BEI introduces competitors into that market by creating a federally supported access pathway for non-FDA-approved cannabinoid products. In other words, CMS gave these competitors preferential regulatory treatment. Under D.C. Circuit precedent, that is sufficient to establish

14

competitor standing. *See Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010) (finding competitor standing where complainant shows "an actual or imminent increase in competition")).

Second, the MMJ Plaintiffs are direct and current competitors in the cannabinoid therapeutics market. MMJIH has invested over $10 million and eight years into developing pharmaceutical-grade cannabinoid therapeutics through the formal FDA botanical drug development pathway. Ex. H ¶¶ 27–28, 43. MMJIH has submitted IND applications to the FDA, obtained Orphan Drug Designation for its Huntington's disease program, holds a DEA Schedule I analytical laboratory registration through MMJBL, and has a pending DEA bulk manufacturing application through MMJBC. Ex. H ¶¶ 4–28. The MMJ Plaintiffs' competitive injury is concrete and particularized: the BEI subjects them to direct competition from entities distributing non-FDA-approved cannabinoid products through Medicare without undertaking any of the pharmaceutical development requirements that MMJ Plaintiffs have spent years and millions of dollars satisfying. Ex. H ¶¶ 34–41. So again, CMS gave these competitors preferential regulatory treatment.

This case is readily distinguishable from *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). In that case, the plaintiffs were doctors and medical associations who objected on moral and ideological grounds to the FDA's regulation of mifepristone. None of those Plaintiffs were market competitors of any entity that benefited from the FDA's action. The Supreme Court held that "sincere legal, moral, ideological, and policy objections" do not, standing alone, "establish a justiciable case or controversy in federal court." *Id.* at 396. The MMJ Plaintiffs do not assert ideological objections. They assert

15

concrete, particularized, demonstrable competitive and economic injury resulting from the BEI's creation of a federally supported access pathway for competing products. Their standing is grounded in the well-established competitor and economic standing doctrine that *Alliance for Hippocratic Medicine* did not disturb.

The BEI directly and concretely injures the MMJ Plaintiffs by creating a federally supported pathway for non-FDA-approved cannabinoid products to reach Medicare beneficiaries, which is the same patient population that MMJ Plaintiffs' FDA-validated therapies would target. This undermines the economic assumptions underlying their multi-year, multi-million-dollar pharmaceutical development investment, diminishes anticipated reimbursement differentiation, adversely affects investor confidence and capital-raising efforts, and creates competitive disadvantage relative to entities that have not undertaken the rigorous scientific validation and regulatory compliance that MMJ Plaintiffs have pursued. Ex. H ¶¶ 34–45.

### b. Organizational Standing.

All Plaintiffs except David Evans and Kenneth Finn, M.D. have organizational standing. *See* Ex. A ¶¶ 9–10 (Niforatos Decl.); Ex. B ¶¶ 10–12 (Ronshausen Decl.); Ex. C ¶¶ 7–9 (Coleman Decl.); Ex. D ¶¶ 7–9 (Snelling Decl.); Ex. E ¶¶ 6–7 (Valente Decl.); Ex. F ¶¶ 22–33 (Evans Decl.); Ex. H ¶¶ 34–41 (Boise Decl.). The BEI has forced these Plaintiff organizations to divert resources from their core programmatic activities, which include direct patient education, clinician training programs, community health intervention, victim advocacy, and developing FDA-approved cannabinoid therapeutics in order to monitor, analyze, and counteract the BEI. This constitutes concrete, demonstrable injury.

16

*See People for the Ethical Treatment of Animals v. United States Dep't of Agriculture*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (finding organizational standing where agency's "inaction injured" an organization's interest and the organization "expended resources to counteract those injuries"); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding impairment of core organizational activities and "consequent drain on the organization's resources" constituted injury to organization).

### c. *Procedural Standing.*

Plaintiffs were denied their right to participate in notice-and-comment rulemaking under 5 U.S.C. § 553. *See* Exs. A–H. Certain plaintiffs are organizations or individuals engaged in victim advocacy and public education about the dangers of unregulated cannabis products, hemp-derived products, THC, CBD, and other cannabinoids. *See* Exs. A–G. MMJ Plaintiffs have competitive and economic interests that the BEI impairs by creating a competing access pathway for Medicare patients to access non-FDA-approved cannabinoid products without notice or an opportunity to comment. *See* Ex. H. The BEI represents a reasonable risk of injury to all of Plaintiffs' particularized interests. *See Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 38 (D.D.C. 2020). The BEI will increase access to these substances, particularly for a vulnerable elderly population, increasing the burden on Plaintiffs to oppose their use and advocate for those harmed. *See Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (outlining elements of procedural standing). Plaintiffs SAM and CIVEL are injured specifically by their inability to comment on the BEI, which expands distribution of cannabinoid products to Medicare patients, as they are involved in administrative proceedings opposing rescheduling of

cannabis that remain ongoing. *See* Ex. A ¶¶ 7, 15 (Niforatos Decl.); Ex. F ¶¶ 22, 24 (Evans Decl.).

The D.C. Circuit and the Supreme Court have consistently recognized that when a plaintiff challenges an action taken without required procedural safeguards, the plaintiff must establish that the agency action threatens a concrete interest, but the "normal standards for immediacy and redressability are relaxed." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). A plaintiff "who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result." *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002); *see also Massachusetts v. EPA*, 549 U.S. 497, 517–18 (2007).

The key requirement is that the procedural violation must threaten a "concrete interest" of the plaintiff—a "procedural right in vacuo" is insufficient. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Here, each Plaintiff has identified concrete interests that the notice-and-comment process is designed to protect: the health and safety of individual Medicare beneficiaries exposed to the BEI (Mr. Evans); the professional interests of physicians affected by the BEI (Dr. Finn); the competitive and economic interests of FDA-regulated competitors whose multi-year investment in the pharmaceutical regulatory pathway is directly impaired (MMJ Plaintiffs); and the programmatic operational interests of organizations whose core activities are directly affected by the BEI (the Organizational Plaintiffs). These are not abstract interests in

18

"having the procedure observed." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.8 (1992). They are concrete, particularized interests that the notice-and-comment process is designed to protect. *See Veneman*, 289 F.3d at 94–95.

The MMJ Plaintiffs' procedural standing is particularly compelling. They are directly affected regulated parties operating under active DEA oversight and FDA IND authorization. Had CMS conducted notice-and-comment rulemaking, MMJ Plaintiffs would have submitted detailed comments addressing protection of the FDA drug approval framework, patient safety and dose reproducibility, reliance interests, competitive harm to FDA-compliant developers, the impact on clinical trial incentives, and the need for coordination between CMS and FDA. Ex. H ¶¶ 50–51 (Boise Decl.). Their interest in commenting on the BEI is not an abstract desire to see the government follow its own rules; it is a concrete interest in preserving the regulatory framework upon which their $10 million, eight-year investment depends. Their interests "fall within the zone of interests" protected by the APA's procedural requirements and the statutory framework governing federal healthcare reimbursement for pharmaceutical products. *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970) (competitors whose economic interests are "arguably within the zone of interests" protected by the relevant statute have standing).

### d. *Individual and Associational Standing.*

David Evans is a 78-year-old Medicare beneficiary who receives primary care through Hopscotch Primary Care, PLLC, which has joined ACO REACH as part of Physicians Healthcare Collaborative ACO. *See* Ex. F ¶¶ 4–5 (Evans Decl.). Mr. Evans is a

three-time cancer survivor who was treated for two forms of cancer while on Medicare, making him particularly vulnerable to the health risks posed by the BEI. Ex. F ¶ 6. His relationship with his health care provider will be negatively affected by imminent implementation of the BEI beginning April 1, 2026. Ex. F ¶ 5, 7. He may be offered products under the BEI by his own healthcare provider. *Id.* He is opposed to expanded access to cannabis and hemp-derived products that have not been proven safe and effective through the FDA approval process. Ex. F ¶ 7. Mr. Evans is also the owner of a critical care nursing home that may be asked to participate in the BEI process. Ex. F ¶ 11. His right to participate in notice-and-comment rulemaking was denied. Ex. F ¶¶ 9–10.

Kenneth Finn, M.D. is a physician who practices comprehensive pain medicine in Prescott, Arizona, who treats Medicare patients, and who possesses specialized expertise in the pharmacology and health effects of cannabis- and hemp-derived products, including as the editor of *Cannabis in Medicine: An Evidence-Based Approach* (2020). *See* Ex. G ¶¶ 3–5 (Finn Decl.). Dr. Finn was granted standing as a Direct Participant in the DEA's ongoing marijuana rescheduling proceedings. Ex. G ¶ 5. Dr. Finn faces concrete professional and economic harm: the absence of dosing guidelines and care standards renders him unable to competently prescribe or administer products under the BEI, causing his practice to lose Medicare patients who wish to access substances under the BEI. Ex. G ¶¶ 13–16. The known adverse health effects of cannabinoid substances expose him and his practice to increased emergency room visits and potential malpractice liability. Ex. G ¶¶ 17–19. The BEI also creates a dangerous regulatory cliff for physicians: the FY 2026 Agriculture Appropriations Act, effective November 2026, resets the legal

20

THC threshold to 0.4 mg total hemp-derived THC per container, potentially rendering products recommended to patients today Schedule I controlled substances by Fall 2026 and creating retroactive legal exposure for physicians. Ex. G ¶ 20. These injuries are concrete, actual or imminent, fairly traceable to the BEI, and redressable by a favorable decision. Ex. G ¶¶ 22–23.

SAM, CIVEL, AALM, NCALM, CIPC, CIVSJ, DFAF, SOS, and DWI have associational standing under *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977). At least one identified member of each of these Plaintiffs, David Evans, is injured by the BEI and has independent standing to sue. *See* Ex. F ¶¶ 4–12 (Evans Decl.). The interests these Plaintiffs seek to protect, namely public health, product safety, and lawful agency procedure, are germane to these organizations' respective purposes of public education about the dangers of cannabis and hemp-derived products and assisting victims of these products. Ex. F ¶¶ 13–20. These organizations are not solely dedicated to opposing government policy they disfavor, but to the aforementioned organizational aims that will receive less time, money, and attention due to the BEI. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Neither the claims asserted nor the declaratory and injunctive relief requested requires Mr. Evans's participation. Ex. F ¶¶ 13–20.

**D.    Plaintiffs Are Likely To Succeed on the Merits**

*a.    CMS violated the APA's notice-and-comment requirements.*

Legislative rules are those that impose "legally binding obligations or prohibitions on regulated parties" and carry "the force and effect of law." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–303 (1979)). A rule is legislative when it "effects a substantive regulatory change to the statutory or

21

regulatory regime." *Mendoza v. Perez*, 754 F.3d 1002, 1006 (D.C. Cir. 2014) (quotation omitted).

The BEI is such a policy. It imposes binding obligations on participating organizations. It creates a new benefit structure for Medicare beneficiaries that conflicts with CMS's prior rule on medical marijuana as well as the CSA, the 2018 Farm Bill, and the Agriculture Appropriations Act. It establishes detailed eligibility criteria. It has the force and effect of law. And as such, the BEI is a legislative rule subject to 5 U.S.C. § 553's notice-and-comment requirements. The BEI applies broadly to a vast number of Medicare beneficiaries, far exceeding the narrow populations envisioned by Section 1115A, which is limited to testing models for "defined populations." No exemption to notice and comment applies. The BEI is not an interpretive rule that clarifies an existing statute or regulation. It is not a general policy statement, nor is it a rule of agency organization, procedure, or practice. It is an agency action with legal force and effect that directly affects the rights and obligations of participating organizations and their aligned Medicare beneficiaries, creating entirely new programmatic requirements for ACO REACH and EOM organizations.

CMS cannot evade the APA's requirements by disguising its rulemaking as a participation agreement amendment. Courts look to "the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply." *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019) (emphasis in original). An agency "may not hide behind its authority to contract in order to evade the APA." *American Hospital Ass'n v. Bowen*, 834 F.2d 1037, 1054 (D.C. Cir. 1987) (quoting

22

district court). "[A]ny contract provisions that are legislative [in character] are subject to § 553's notice and comment requirements." *Id.* Moreover, Section 1115A contains no express exemption from the APA rulemaking requirements. *See* 5 U.S.C. § 559; *see also Asiana Airlines v. FAA*, 134 F.3d 393, 397 (D.C. Cir. 1998) (exemption is express only when Congress "has established procedures so clearly different from those required by the APA that it must have intended to displace the norm").

CMS's failure to publish the BEI, which is a generally applicable policy with legal effect—*i.e.*, a substantive rule—in the Federal Register violates 5 U.S.C. § 552(a)(1) and the Federal Register Act, 44 U.S.C. § 1505. This independently violates the APA. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020 (D.C. Cir. 2000). Moreover, CMS's procedural violations render the BEI invalid. *See* 5 U.S.C. § 706(2)(D).

### b. The BEI is arbitrary, capricious, and not reasonably explained.

Agency action must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An "unexplained inconsistency" renders a changed policy arbitrary and capricious. *Children's Hosp. Ass'n of Texas v. Azar*, 933 F.3d 764, 773 (D.C. Cir. 2019). When an agency reverses course, it must provide "a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009)).

The BEI flunks this requirement. CMS gave no explanation whatsoever for its action, which conflicts with its April 2025 final rule categorically excluding medical cannabis from supplemental Medicare Advantage coverage. By attempting this "end-

23

around" and inserting the BEI into participation agreements without any analysis or justification for its change in position, CMS violated the APA by engaging in arbitrary action. *See Encino Motorcars, LLC*, 579 U.S. at 222.

CMS also failed to consider important aspects of the problem. *See Motor Vehicles Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 43 (1983) (finding such action arbitrary and capricious). CMS did not address the legal status under the CSA of the products it makes more available. CMS also did not account for the voluminous peer-reviewed evidence of cardiovascular harm, liver injury, drug interactions, and cognitive harm from cannabis and hemp-derived products. It failed to address the known pervasive contamination and mislabeling of commercially available CBD products. It ignored the absence of any FDA regulatory framework for cannabinoids, including CBD. It disregarded the near-total lack of clinical research on cannabis use in populations over 65. Each failure independently renders the BEI arbitrary and capricious. *Id.*

CMS's THC limit of 3mg per serving also directly conflicts with the CSA, the 2018 Farm Bill and 2026 Agriculture Appropriations Act. CMS's dubious promise that it "will adjust its definition in accordance with the law," despite having inexplicably drafted the definition in violation of the law in the first instance, is of little comfort and itself an acknowledgement that the BEI as constituted conflicts with enacted federal law.

CMS also failed to explain how this rule complies with its own statutory responsibility under Section 1115A, which limits testing to "defined populations with deficits in care leading to poor clinical outcomes or potentially avoidable expenditures." CMS provides no basis for concluding that individuals, currently capable of purchasing

24

hemp-derived cannabis on their own, suffer from deficits in care, nor does it provide any information regarding patient outcomes for those deprived of hemp-derived cannabis or evidence of any expenditures that would be avoided as a result of this program.

CMS's own CY2027 Rule, published on April 6, 2026 after full notice-and-comment, confirms the BEI's arbitrariness. *See* 91 Fed. Reg. 17,384 *et seq.* (Apr. 6, 2026). In that rule, CMS acknowledged that its "authority does not extend to the direct regulation of cannabis-derived products" and stated that "any changes to SSBCI requirements will be made by requesting public comment on a proposed regulation through a Notice of Proposed Rulemaking." *Id.* at 17,432–17,433. The CY2027 Rule further confirmed that the only cannabis-derived products currently permissible under applicable federal law are hulled hemp seed, hemp seed protein powder, and hemp seed oil. *Id.* at 17,432. Yet the BEI authorizes a far broader range of hemp-derived THC and CBD products for distribution to Medicare beneficiaries without any of the procedural protections CMS applied in the CY2027 rulemaking. Additionally, the contrast between CMS's meticulous adherence to APA procedures for the CY2027 Rule and its complete bypass of notice-and-comment for the BEI underscores the arbitrariness of the agency's action and confirms that CMS knows how to comply with the APA when it chooses to do so.

### c.  *The BEI exceeds CMS's statutory authority.*

Where an agency asserts authority of vast economic and political significance, like authority to increase access to cannabinoids, "the agency must point to clear congressional authorization for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation omitted) (detailing the major questions doctrine). CMS has not done

so. Using a statutory provision designed to test payment and delivery models to create *de facto* federal health insurance access to Schedule I substances for millions of Medicare beneficiaries is precisely the kind of action that demands clear statutory authority. But CMS has no statutory authority, under Section 1115A or otherwise, to create a program that allows access to harmful, dangerous, and illegal substances without APA rulemaking.

No precedent exists for using Innovation Center models to distribute specific consumer products to beneficiaries, because those models are not intended for that purpose. These models are pilot or demonstration projects designed to test new payment and care delivery approaches for Medicare and Medicaid. Their purpose is to improve care quality, lower costs, and promote value-based care by encouraging best medical and financial practices through financial incentives or shared savings/risk arrangements—not to serve as a distribution system for specific consumer products.

Not only that, but the political, economic, and public health significance of the BEI is profound. By effectively creating a nationwide pathway for Medicare beneficiaries to access Schedule I cannabinoids, the program implicates federal law, healthcare spending of billions of taxpayer dollars, and regulatory oversight of controlled substances. Moreover, the program has been explicitly championed at the highest levels by the executive and powerful special interests. The Trump Administration has ordered its implementation, Administrator Oz has made public statements in its favor, and the cannabis industry has celebrated its arrival. These factors demonstrate that the BEI is not a routine administrative action, but a sweeping policy with broad economic, health, and

26

political consequences. Given the unprecedented scope of this initiative, which is entirely beyond and out of step with past initiatives, the major questions doctrine applies in full force. *West Virginia*, 597 U.S. at 716 (applying doctrine to questions of "vast economic and political significance"), 721 (applying doctrine when "the sheer scope of . . . claimed authority" and the "unprecedented" nature of action provide reason for pause). An agency, manifestly subject to extraordinary political pressures, cannot appropriate such transformative authority without a clear and specific grant of congressional authorization.

### d. The BEI conflicts with federal law.

The BEI is plainly "not in accordance with law" and therefore violates 5 U.S.C. § 706(2)(A). Its THC limits conflict with the 2018 Farm Bill and 2026 Agriculture Appropriations Act. Moreover, the BEI facilitates widespread access to substances that remain Schedule I under the CSA.

No hemp-derived nor THC-bearing product has been approved by FDA for medical use, and the agency has identified significant safety risks associated with cannabinoid consumption. *See Consumer Updates*, Fed. Drug Admin. (Mar. 5, 2020), https://www.fda.gov/consumers/consumer-updates/what-you-need-know-and-what-were-working-find-out-about-products-containing-cannabis-or-cannabis; *Public Health Focus*, Fed. Drug Admin. (July 16, 2024), https://www.fda.gov/news-events/public-health-focus/fda-regulation-cannabis-and-cannabis-derived-products-including-cannabidiol-cbd. CMS conducted no compliance analysis before issuing the BEI. *See PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797–98 (D.C. Cir. 2004) (agency must "bring

27

its experience and expertise to bear" and evaluate statutory status of drug-related product when status was unclear). In fact, a prior APA compliant process completed less than one year prior determined that the health effects of medical marijuana, containing the same or comparable ingredients as hemp-derived cannabinoids, were not sufficient to justify use by Medicare patients. *See* 90 Fed. Reg. 15792, 15867 (Apr. 15, 2025). An agency does not act reasonably when it creates a program to allow distribution of substances that are dangerous, illegal, or harmful to health and disregards its own very recent comprehensive analysis.

### e. *The BEI violates equal protection.*

The BEI creates a two-track regulatory system that violates the Fifth Amendment's equal protection guarantee. The MMJ Plaintiffs have complied in good faith with the federal pharmaceutical regulatory framework, investing years and over $10 million into IND submissions, orphan drug designation, DEA registrations, and clinical trial preparation. Ex. H ¶¶ 27–28, 43, 53 (Boise Decl.). Meanwhile, the BEI permits entities that have not undertaken any of these regulatory burdens—including Charlotte's Web and other hemp-industry stakeholders who received advance notice of the BEI—to access a federally supported cannabinoid distribution pathway for the same Medicare patient populations. Ex. H ¶¶ 47–49.

CMS provided advance notice of the BEI to hemp-industry stakeholders while excluding similarly situated regulated parties such as the MMJ Plaintiffs from any notice of or opportunity to participate in the development of the BEI. Charlotte's Web co-founder Jared Stanley confirmed on February 13, 2026 that the BEI was "internally

28

finalized" by CMS weeks prior, and referred to a "briefing" that hemp-industry insiders had received. Ex. H ¶¶ 47–48 (Boise Decl.). This disparate treatment of similarly situated regulated parties—those developing cannabinoid products for the same patient populations—without any rational basis is a class-of-one Fifth Amendment equal protection violation. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." (citations omitted)).

### f.   *The BEI violates due process.*

The BEI implicates both procedural and substantive due process concerns. CMS implemented the BEI without affording directly affected regulated parties—including the MMJ Plaintiffs, who operate under active DEA oversight and FDA IND authorization— any opportunity to be heard. Ex. H ¶¶ 50–52, 55 (Boise Decl.). The BEI retroactively undermines the investment-backed expectations of parties who entered the federal pharmaceutical regulatory pathway in reliance on an established and consistently applied framework, and deprives them of the economic value of their regulatory compliance without any process whatsoever. Ex. H ¶¶ 53–54. The MMJ Plaintiffs' over $10 million investment was structured around the understanding that reimbursement eligibility would follow FDA clinical validation, not precede it. Ex. H ¶¶ 29, 42. The BEI's creation of an alternative access channel for non-FDA-approved products, without notice, without comment, and without any opportunity for affected parties to be heard, is a

29

denial of due process under the Fifth Amendment of the United States Constitution. Ex. H ¶¶ 53–55.

### E.   Plaintiffs Will Suffer Irreparable Harm Absent Relief

Plaintiffs have suffered and will continue to suffer irreparable harm if this Court does not act. This harm is not speculative. It is certain.

First, the MMJ Plaintiffs suffer ongoing, irreparable competitive and economic harm. Every day the BEI is in effect, unvalidated cannabinoid products gain market access and consumer acceptance in the Medicare population, undermining the commercial viability of the FDA-approved cannabinoid products that MMJ is developing. Ex. H ¶¶ 56–59 (Boise Decl.). This harm compounds over time and cannot be undone retroactively. Once Medicare providers and beneficiaries become accustomed to receiving cannabinoid products without FDA approval, the market differentiation that the MMJ Plaintiffs' IND-based development sought to secure will be permanently diminished in scope and value. *See id.* This is precisely the type of competitive injury that courts have recognized as irreparable. *See, e.g., Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43 (D.D.C. 2000) (loss of competitive position constitutes irreparable harm).

Second, Plaintiffs will suffer procedural injury if the BEI goes into effect without notice or comment. When an agency flouts the APA in this way, the deprivation of the right to participate in the rulemaking process is a harm that cannot be remedied after the fact. "It is well established that the harm suffered by those who would otherwise participate in agency rulemaking under the APA is to be considered irreparable when the agency fails to afford them their rights to such participation." *Nat'l Treasury Emps. Union*

*v. Newman*, 768 F. Supp. 8, 10 (D.D.C. 1991) (quotation omitted). The D.C. Circuit has recognized that procedural violations of the APA cause irreparable harm because the right to participate in the rulemaking process, once denied, cannot be restored retroactively. *See Veneman*, 289 F.3d at 94–95 (rejecting government's claim of harmless error where agency bypassed notice-and-comment procedures entirely). Every single Plaintiff would have filed comments with CMS had the BEI proceeded through proper notice-and-comment rulemaking. Ex. A ¶ 13 (Niforatos Decl.); Ex. B ¶ 14 (Ronshausen Decl.); Ex. C ¶ 11 (Coleman Decl.); Ex. D ¶ 11 (Snelling Decl.); Ex. E ¶ 9–10 (Valente Decl.); Ex. F ¶ 9 (Evans Decl.); Ex. G ¶¶ 8–9 (Finn Decl.); Ex. H ¶¶ 50–51 (Boise Decl.). This harm is now irreparable as the BEI has taken effect without notice or comment.

Third, David Evans is a Medicare beneficiary aligned with an organization that participates in ACO REACH—his primary care medical office, Hopscotch Primary Care, PLLC, which participates as part of Physicians Healthcare Collaborative ACO. Ex. F ¶¶ 4–5 (Evans Decl.). He faces imminent implementation of a program that will make hemp-derived THC products available through his healthcare provider. Ex. F ¶ 5. As a 78-year-old, three-time cancer survivor, Mr. Evans is a member of the population most vulnerable to the cardiovascular, neurological, cognitive, and drug-interaction harms documented in the peer-reviewed literature regarding these products. Ex. F ¶¶ 6–7. He does not want unapproved products provided by or through his Medicare provider due to their serious and well-documented health risks and the fact that they have not been proven safe and effective. Ex. F ¶ 7. This program was developed and adopted without any opportunity

for his participation in the rulemaking process, and without any analysis of the safety of hemp-derived products for American seniors like him. Ex. F ¶¶ 9–10.

Fourth, many of the Plaintiffs are suffering concrete, ongoing injury to their core programmatic activities. They have been required to divert significant resources from their educational and care-focused missions, which include expenditures for community health, physician training, and victim assistance, to monitor and counteract the BEI's harmful effects on their target populations. *See* Ex. A ¶¶ 9–10 (Niforatos Decl.); Ex. B ¶¶ 10–12 (Ronshausen Decl.); Ex. C ¶¶ 7–9 (Coleman Decl.); Ex. D ¶¶ 7–9 (Snelling Decl.); Ex. F ¶¶ 23, 26, 28, 30, 32 (Evans Decl.). The BEI will also create more victims of cannabinoids and a more intractable educational problem, requiring further expenditures. As long as the BEI is in effect, this diversion of resources will continue.

Fifth and finally, Plaintiffs will suffer irreparable injury due to the public-health catastrophe the BEI will unleash. The FDA has identified safety risks associated with CBD. Scientific evidence suggests these risks are particularly acute for Medicare beneficiaries who are elderly, take multiple medications, and are at high risk of drug interactions. By making Schedule I substances available to seniors without any examination of health risks, CMS has committed grievous harm that cannot be remedied without the requested relief.

### F.    The Balance of the Equities and Public Interest Favor Relief

Because the government is a party, the balance of equities and public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

32

There is a strong public interest in agencies following the law. *See League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (finding "generally no public interest in the perpetuation of unlawful agency action"). The APA's notice-and-comment requirements ensure public participation, transparency, and deliberative decision-making. Requiring CMS to follow the procedures Congress established serves the public interest.

There is also a strong public interest in protecting vulnerable Americans from products distributed without adequate safety analysis and without an established federal regulatory framework. Heart disease is the leading cause of death among Americans over 65. Peer-reviewed research documents that cannabis use is associated with a two-fold increase in risk of cardiovascular death. CMS has not acknowledged this evidence, much less analyzed it.

A stay merely preserves the *status quo* prior to April 1, 2026 in which the BEI did not exist. Maintaining this state of things pending a decision on the merits imposes no cognizable harm on anyone. It only requires CMS to continue operating without the BEI while the Court reviews whether the BEI was lawfully adopted. The government has no legitimate interest in implementing an unlawfully adopted rule. *See generally Veneman*, 289 F.3d 89  (rejecting government's claim of harmless error where agency bypassed notice-and-comment procedures entirely).

### G.    The Court Should Issue Relief Under Rule 65 and 5 U.S.C. § 705

Given the serious and stark nature of CMS's error, and the imminence of the harm associated with the BEI, which takes effect on April 1, 2026, a preliminary injunction

under Rule 65(a) is appropriate given the overwhelming strength of Plaintiff's claims on the merits. This Court also has authority under the APA to stay this action pending review and provide relief to all persons subject to the BEI, not just Plaintiffs. 5 U.S.C. § 705.

Plaintiffs would prefer that this Court issue a stay under 5 U.S.C. § 705. "To the extent the district court considers the public interest and the conveniences of the parties, the court is limited to evaluating how such interest and conveniences are affected by the selection of an injunction over other enforcement mechanisms." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 498 (2001). A stay is preferable for the Plaintiffs because Section 705 does not authorize courts to condition stays on the posting of a bond, whereas Rule 65(c) does authorize courts to condition preliminary injunctions on the posting of a bond. This is an APA challenge seeking to maintain the *status quo*, with no monetary harm to the defendants that will result from a stay. As such, should this Court issue relief under Rule 65, Plaintiffs request a nominal or zero bond given the nature of the claims.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order:

    a.    Preliminarily enjoining Defendants from implementing, applying, or enforcing the BEI pending resolution of this action on the merits pursuant to Rule 65(a);

b. Staying the effective date of the BEI pending conclusion of judicial review under 5 U.S.C. § 705;

c. Expediting briefing and a hearing on this motion; and

d. Granting such other and further relief as the Court deems just and proper.

Date: April 13, 2026                     Respectfully submitted,


                                         _/s/Connor W. Mighell_

                                         Connor W. Mighell
                                             TX Bar #24110107
                                             D.D.C. Bar ID #TX0032
                                         **BURKE LAW GROUP, PLLC**
                                         1000 Main Street, Suite 2300
                                         Houston, Texas 77002
                                         Telephone: (832) 987-2214
                                         Fax: (832) 793-0045
                                         connor.mighell@burkegroup.law

                                         Ilya Shapiro*
                                             DC Bar #489100
                                         **BURKE LAW GROUP, PLLC**
                                         2001 L Street NW, Suite 500
                                         Washington, D.C. 20036
                                         ilya.shapiro@burkegroup.law
                                         *Admission Pending*

                                         Patrick Kenneally**
                                             IL Bar #6286573
                                         **BURKE LAW GROUP, PLLC**
                                         205 N Michigan Avenue, Suite 810
                                         Chicago, Illinois 60601
                                         patrick.kenneally@burkegroup.law
                                         **Pro Hac Vice Forthcoming*

                                         **Attorneys for Plaintiffs**


36