**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SMART APPROACHES TO
MARIJUANA, *et al.*,

    *Plaintiffs*,

v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and
Human Services, *et al.*,

    *Defendants.*

Case No. 1:26-CV-01081-TNM

**PLAINTIFFS' REPLY IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND STAY OF AGENCY ACTION PENDING JUDICIAL REVIEW
AND RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

Defendants' Combined Opposition and Motion to Dismiss confirms what Plaintiffs alleged: they violated the law. The Centers for Medicare & Medicaid Services ("CMS") adopted the Substance Access Beneficiary Engagement Incentive ("BEI") on April 1, 2026 without notice, without comment, without any reasoned or reasonable explanation, and without any analysis of the risks the products it incentivized posed to elderly Medicare beneficiaries. This action runs afoul of the Constitution and the Administrative Procedure Act ("APA"). Defendants try to avoid liability by invoking a series of jurisdictional smokescreens and other blustery arguments that evaporate on examination. Plaintiffs address each in turn.

1

## I.     Plaintiffs Have Standing

### A.     MMJ Plaintiffs have suffered constitutional injury and have competitor standing.

Defendants, properly assessing the threat, devote more pages to MMJ Plaintiffs' standing than to any other issue. Their arguments can be distilled to three propositions: 1) MMJ International Holdings ("MMJIH") and its subsidiaries have no approved product, Defs. Mem. at 14; 2) MMJIH does not compete in the same market as BEI-approved products, *id.* at 15; and 3) MMJ Plaintiffs' injuries are speculative, *id.* at 16–17. Each of these propositions is wrong.

This Court has made clear that "parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998). A plaintiff need only show "an actual or imminent increase in competition" and that it is "a direct and current competitor" whose "bottom line may be adversely affected by the challenged government action." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 280 (D.C. Cir. 2023) (quotations omitted). MMJ Plaintiffs satisfy each element.

First, and with respect to Defendants' assertion that MMJIH has "no approved product" and remains on Full Clinical Hold, Defs. Mem. at 6, 14, Defendants mischaracterize the standard. Competitor standing does not require a plaintiff to have an approved product on the market; it requires only that the plaintiff be a "direct and current competitor" in the relevant market. *Yellen*, 66 F.4th at 280; *Sherley v. Sebelius*, 610 F.3d 69, 73–74 (D.C. Cir. 2010) (granting competitor standing to researchers who had not yet completed the research that would yield an approved product). MMJ Plaintiffs have

2

invested over $10 million and eight years developing pharmaceutical-grade cannabinoid therapeutics through the FDA's botanical drug pathway. It is undisputed that they hold Investigational New Drug ("IND") submissions, were awarded an Orphan Drug Designation, and possess a DEA Schedule I analytical laboratory registration. *See* Defs. Mem. at 36. A clinical hold is a routine, frequently transitory step in FDA review. Without getting into a battle of antitrust experts to delve into granular market analysis, MMJ Plaintiffs can easily be described as "direct and current competitors" in the cannabinoid therapeutics market in both legal and layman's terms. Defendants' citation to *Incyte Corp. v. Sun Pharmaceutical Industries, Inc.*, No. 2023-1300 (Fed. Cir. May 7, 2025), is unavailing: *Incyte* involved a company with no concrete plans to enter a market. MMJ Plaintiffs' $10 million investment, Orphan Drug Designation, IND applications, and active DEA registrations, in contrast, are concrete competitive engagements.

Second, and with respect to Defendants' argument that MMJIH does not compete in the same market as BEI-approved products, Defendants argue that no Medicare beneficiary with Huntington's disease will choose between an FDA-approved therapy and "a CBD gummy." Defs. Mem. at 15. This framing mischaracterizes the products available under the BEI and misses the point. The BEI creates a federally supported pathway for non-FDA-approved cannabinoid products to reach the same Medicare patient populations that MMJ Plaintiffs' therapies are designed to serve. Before the BEI, no such pathway existed. The BEI created one, flooding MMJIH's market in cannabinoid therapeutics with unapproved products and disadvantaging companies like them that followed the FDA's rules. The BEI contains no requirements or limitations preventing

physicians from prescribing CBD gummies or any other non-FDA-approved cannabinoid substance for any disease, including those that MMJIH is targeting.

Third, Defendants' reliance on *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ("*AHM*") to establish that MMJ's injuries are speculative is inapposite. *See* Defs. Mem. at 17–18. *AHM* involved plaintiffs who were not market competitors; the Court held that "sincere legal, moral, ideological, and policy objections" do not *by themselves* establish a case or controversy. 602 U.S. at 396. MMJ Plaintiffs do not assert ideological objections. They assert concrete competitive and economic injury—the kind this Court has recognized as independently sufficient under the competitor standing doctrine. *See Sherley*, 610 F.3d at 73–74; *Yellen*, 66 F.4th at 280. *AHM* did not address, let alone reject, that doctrine. Defendants' *Clapper* argument fares no better. *See* Defs. Mem. at 16–17 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)). *Clapper* involved plaintiffs who speculated about surveillance that might never target them. Here, the BEI is already in effect and has already created a federally supported pathway for non-FDA-approved cannabinoid products to reach the same Medicare populations MMJ Plaintiffs are developing products to serve. These are present competitive conditions, not future contingencies. *See Yellen*, 66 F.4th at 280.

Lastly, Defendants tout MMJ's public statement that the BEI "confirms what we have said for years" as evidence MMJ cannot claim injury. Defs. Mem. at 16–17. But a company's attempt to position itself favorably with investors does not negate competitive harm. The factual record, not investor communications, should guide this Court as it evaluates standing.

4

**B.    The Organizational Plaintiffs have standing.**

Defendants argue the Organizational Plaintiffs (meaning all non-individual Plaintiffs) are indistinguishable from the unsuccessful plaintiffs in *Ctr. for Biological Diversity v. DOI*, 144 F.4th 296 (D.C. Cir. 2025). *See* Defs. Mem. at 10–13. Not so. There, the organizations' alleged injuries were "limited to issue advocacy"—FOIA requests and lobbying—and the court found "no harm to [their] own activities apart from [their] advocacy." *Id.* at 314–15. The Organizational Plaintiffs here operate concrete programmatic activities directly impaired by the BEI. For instance, SAM runs educational programs for physicians and the public. DFAF provides victim advocacy and community-based prevention programming. HCADA operates student substance-prevention clubs and safe-rides programs. MMJ Plaintiffs are a pharmaceutical company. And CIVEL provides direct legal training for attorneys representing cannabis-injury victims, litigation support, and educational programming for clinicians. *See* Doc. No. 28-6 ¶¶ 22–33 (Evans Decl.); *see also* Doc. No. 25–2 at 24 (DEA ALJ finding that CIVEL's "active litigation and litigation support missions provide a sufficient basis to conclude that it would possess knowledge that could be instrumental in an accurate disposition" of marijuana rescheduling proceeding). The D.C. Circuit has held that organizations providing "counseling, referral, advocacy, and educational services" satisfy the *Havens Realty* threshold. *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (quotation omitted); *see also People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (finding standing where the

organization expended resources "in response to, and to counteract, the effects of the defendants' alleged unlawful acts rather than in anticipation of litigation" (cleaned up)).

The BEI fundamentally alters the landscape in which these organizations operate. When CMS creates a federally supported pathway for distributing hemp-derived THC products to Medicare beneficiaries, it undermines the educational and prevention messages these organizations deliver to the very population the BEI targets. Those physicians these organizations have trained must now contend with a federal program sanctioning the distribution of the same products as "medicine." Elderly Medicare patients must navigate a healthcare system in which their providers may offer products these organizations have spent years warning against. CIVEL must devote resources to training attorneys to address a new category of injury claims. MMJ Plaintiffs must expend capital assessing and addressing this new, concrete threat to their market posed by the BEI. These are operational costs "beyond those normally expended" to carry out these organizations' respective missions. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015) (quotation omitted). Defendants invoke *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276–77 (D.C. Cir. 1994), but that case addressed an organization that chose to investigate the defendant — a self-initiated response. Here, the BEI affirmatively impairs these organizations' existing programs: CIVEL, for example, must now retrain more attorneys because a government program is distributing dangerous THC-containing products to elderly patients.

The distinction is clear under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), which held that an organization has standing when the defendant's conduct has

6

caused "concrete and demonstrable injury to the organization's activities" that constitutes "far more than simply a setback to the organization's abstract social interests." The BEI impairs the Organizational Plaintiffs' ability to deliver their core services because resources have been shifted to countering the BEI, and will be devoted to ameliorating the harm caused by the BEI. Although Defendants may frame the Organizational Plaintiffs' objections as abstract, their resistance stems from the concrete harm the policy will cause and the resources they will be forced to expend addressing it.

Defendants' reliance on *Gettman v. DEA*, 290 F.3d 430 (D.C. Cir. 2002), to deny standing to Plaintiffs as mere "cannabis-policy advocates," *see* Defs.' Mem. at 1, 9, 11, is misplaced. *Gettman* involved advocates seeking to reschedule marijuana for general policy reasons; none operated concrete programmatic activities or held competitor interests. Plaintiffs here include organizations with concrete programs, a pharmaceutical company with competitive interests, a Medicare beneficiary directly affected, and a physician with professional interests at stake. *AstraZeneca Pharms. LP v. HHS*, 137 F.4th 116 (3d Cir. 2025), is a non-binding Third Circuit decision involving a diversified company that could not identify any specific development decision affected by the challenged action. Conversely, MMJ is a single-product company whose business model depends on the FDA pathway the BEI bypasses. *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013), involved mootness from voluntary cessation of trademark enforcement—it says nothing about competitor standing. And *Hemp Industries Ass'n v. DEA*, 36 F.4th 269 (D.C. Cir. 2022), is distinguishable because those hemp industry members did not produce a

7

competing product; MMJ is developing cannabinoid therapeutics for the same patient populations the BEI targets.

Defendants also criticize the organizational declarations as following a similar template. Defs. Mem. at 11–12. But consistent language describing consistent injuries reflects the reality that the BEI injures each organization similarly. The relevant question is whether the facts in each declaration demonstrate concrete injury to that Plaintiff's specific activities. They do. *See PETA*, 797 F.3d at 1094 (finding standing where the organization expended resources to counter the effects of the defendant's unlawful acts).

### C.   Mr. Evans and Dr. Finn have standing.

Defendants mischaracterize Mr. Evans's injury as "an offense to his sensibilities." Defs. Mem. at 19. That characterization itself may be an offense to his sensibilities, but it does not accurately describe what Mr. Evans is alleging. Mr. Evans is a 78-year-old, three-time cancer survivor who receives care from an ACO REACH participant. The BEI is now in effect. Accordingly, his provider may elect it at any time and recommend dangerous cannabinoid products to him. His injury is not a policy objection, but procedural: CMS adopted a program with concrete implications for his healthcare without any opportunity for public participation, without any analysis of the safety risks to patients like him, and without any notice. *See Lujan*, 504 U.S. at 572 n.7; *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002) (plaintiff denied a procedural right protecting his concrete interests need not show agency action will inevitably reach him).

Defendants' *Clapper* argument, *see* Defs. Mem. at 19, misapprehends the claim. *Clapper* involved plaintiffs who could not show the surveillance program at issue would

8

ever target them. 568 U.S. at 414. Mr. Evans is aligned with an ACO REACH provider and the BEI is already in effect. More importantly, his primary injury is procedural. A "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. Mr. Evans has such a concrete interest—his healthcare relationship with an ACO REACH provider—and the notice-and-comment process is designed to protect it. *See Veneman*, 289 F.3d at 94–95.

Defendants observe that Dr. Finn does not participate in any Innovation Center model. Defs. Mem. at 6. That observation misses the point. Dr. Finn is a physician with specialized expertise in cannabis pharmacology who treats Medicare patients. The BEI creates concrete professional and economic harms that do not require Dr. Finn's direct participation in the program: (1) the absence of dosing guidelines renders him unable to competently advise his patients about products they may be offered under the BEI; (2) the FY2026 Agriculture Appropriations Act's November 2026 deadline further limiting THC content for hemp-derived products creates a regulatory cliff exposing physicians to legal liability; and (3) patients may leave his practice for providers who participate in the BEI. These are specific, discrete, and *concrete* consequences of CMS's procedural failures.

### D.    Procedural standing independently supports jurisdiction.

Procedural standing similarly and independently supports jurisdiction. *See Lujan*, 504 U.S. at 572 n.7; *see also Massachusetts v. EPA*, 549 U.S. 497, 517–18 (2007).

Each Plaintiff has identified a concrete interest the notice-and-comment process is designed to protect. Defendants' assertion that Plaintiffs' interests are "indistinguishable

from their interest in opposing" the BEI, Defs. Mem. at 21, collapses the distinction between the right to participate in rulemaking and the substance of the comments that would be submitted. If accepted, this argument would eliminate procedural standing whenever a plaintiff opposes the challenged action—rendering the doctrine null. Defendants' reliance on *American Institute of Certified Public Accountants v. IRS*, 804 F.3d 1193 (D.C. Cir. 2015) ("*AICPA*"), is unavailing. *AICPA* held that the right to participate in notice-and-comment protects parties with a concrete stake in the regulatory outcome. *Id.* at 1198. It did not hold that procedural standing is unavailable whenever a plaintiff also opposes the policy. Plaintiffs here have concrete interests. MMJ Plaintiffs have competitive interests. The Organizational Plaintiffs have operationally impaired programs. Mr. Evans has a healthcare relationship with an ACO REACH provider. And Dr. Finn has professional and economic interests. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009).

## II.    The BEI Is Judicially Reviewable

### A.    Section 1115A does not preclude this challenge.

Defendants argue that § 1115A(d)(2) precludes judicial review of the BEI. *See* Defs. Mem. at 26–28. But in *Regeneron Pharmaceuticals, Inc. v. HHS*, 510 F. Supp. 3d 29, 45 (S.D.N.Y. 2020), the court reasoned that while § 1115A bars review of specific facets of Innovation Center models, including the selection of models and the elements, parameters, scope, and duration of those models, "[i]t does not bar review of the propriety of the procedures used for establishing such models."

Defendants attempt to distinguish *Regeneron* as involving a mandatory model. Defs. Mem. at 27. This is immaterial. *Regeneron*'s reasoning focused on the text of § 1115A,

10

which precludes review of specific categories of decisions but not review of procedural compliance, no matter the nature of the model. If Congress had intended to completely bar review of rulemaking procedures, "it could have precluded review of the 'establishment' of" such models. *Regeneron*, 510 F. Supp. 3d at 45. The Second Circuit's analysis in *Yale New Haven Hospital v. Becerra*, 56 F.4th 9, 18–19 (2d Cir. 2022), reinforces this reading: after surveying ACA-era preclusion provisions, the court found that Congress's omission of language precluding challenges to the "establishment" of models does not signify intent to allow procedural challenges—it confirms that the preclusion bar was never directed at procedure in the first place.

Defendants further contend that Plaintiffs' procedural challenge is merely a "backdoor" substantive challenge. Defs. Mem. at 26–27. Not so. Plaintiffs do not ask this Court to decide whether the BEI is good policy. They ask whether CMS followed required procedures. The D.C. Circuit has held that the APA's procedural requirements "support several important functions wholly distinct from judicial review," including ensuring that the rule is "subjected to thoroughgoing analysis and critique by interested parties." *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995). A procedural challenge is not converted into a substantive one because the plaintiff also disagrees with the policy.

There is a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). The statutory text of § 1115A(d)(2) precludes review of substantive design choices for models, not the procedural pathway by which CMS adopts them. Defendants have identified no provision of § 1115A that clearly precludes review of procedural challenges.

11

To adopt their reading would mean Congress silently repealed every APA procedural protection for any action CMS labels a "model component." That is not a plausible reading, particularly given the "strong presumption" favoring review and the D.C. Circuit's holding that APA procedures are "enforceable apart from the reviewability of the underlying action." *Am. Med. Ass'n*, 57 F.3d at 1134.

**B.    5 U.S.C. § 553(a)(2) does not exempt the BEI.**

Defendants rely on *Humana of S.C., Inc. v. Califano*, 590 F.2d 1070 (D.C. Cir. 1978), for the proposition that § 553(a)(2)'s benefits exception applies to Medicare. *See* Defs. Mem. at 30–32. *Humana* involved a standard reimbursement regulation—the rate of return on equity capital recoverable by hospitals. *Id.* at 1074, 1083. The BEI is not a reimbursement regulation. It does not adjust payments owed to providers. It distributes consumer products containing THC through a novel regulatory framework. Defendants themselves argue CMS does not pay for the products and no new entitlement is created. Defs. Mem. at 5–6. If so, the BEI does not "clearly and directly" implicate "benefits" as *Humana* used that term. *Id.* at 1082. Defendants point to the rescission of the Richardson Waiver as restoring the benefits exception. Defs. Mem. at 31–32. But the Waiver's half-century existence confirms the recognized importance of public participation in Medicare rulemaking. Its rescission—a discretionary executive policy decision—cannot convert an unprecedented product-distribution program into the routine benefit administration that § 553(a)(2) was designed to exempt. *See Humana*, 590 F.2d at 1082 ("Section 553(a)(2) cuts a wide swath through the safeguards generally imposed on agency action" and applies only where the exempted subject matter is "clearly and directly" involved).

12

### C.    Plaintiffs have a cause of action.

Defendants argue no statute whose "zone of interests" encompasses Plaintiffs provides an enforceable notice-and-comment obligation. *See* Defs. Mem. at 22–26. As a threshold matter, the zone-of-interests inquiry is "not a demanding one," and a plaintiff fails it only when "its interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Mendoza v. Perez*, 754 F.3d 1002, 1017 (D.C. Cir. 2014) (quotation omitted). Importantly, this inquiry is not jurisdictional; it is a merits question going to whether Plaintiffs have stated a valid cause of action. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.4 (2014); *CSL Plasma Inc. v. U.S. Customs & Border Protection*, 33 F.4th 584, 596 (D.C. Cir. 2022).

MMJ Plaintiffs' competitive interests fall within the zone of interests of the statutes governing Medicare and pharmaceutical regulation, as well as the APA. The other Organizational Plaintiffs face diversion of resources from core programmatic activities. Mr. Evans and Dr. Finn have interests as a Medicare beneficiary and physician, respectively. Defendants' citation to *Bonds v. Tandy*, 457 F.3d 409 (5th Cir. 2006), *see* Defs. Mem. at 25, is inapposite: Plaintiffs do not assert a cause of action under the CSA. They assert claims under the APA, which provides a cause of action to any person "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Their interests in procedural regularity, competitive fairness, and public health fall within the zone of interests of the APA and Section 1115A. *See Mendoza*, 754 F.3d at 1017.

### III.    Plaintiffs Are Likely to Succeed on the Merits

13

### A.    The BEI is a legislative rule requiring notice and comment.

Defendants argue that the BEI is not a legislative rule because it is an optional component of voluntary CMMI models implemented through participation agreements. *See* Defs.' Mem. at 28–30. But the D.C. Circuit has squarely held that agencies "may not hide behind [their] authority to contract in order to evade the APA" and that "any contract provisions that are legislative [in character] are subject to § 553's notice and comment requirements." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1054 (D.C. Cir. 1987).

Defendants attempt to distinguish *Am. Hosp. Ass'n* on the grounds that it involved a mandatory condition of participation. Defs.' Mem. at 30. But the court's holding was categorical: "*any* contract provisions that are legislative [in character] are subject to § 553's notice and comment requirements." 834 F.2d at 1054 (emphasis added). The BEI imposes binding eligibility criteria, reporting obligations, implementation plan requirements, product specifications, dosing limits, and CMS approval and suspension authority on participating healthcare organizations—obligations carrying the force and effect of law. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015); *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979). Indeed, the D.C. Circuit in *Am. Hosp. Ass'n v. Bowen* warned that if HHS were to "insert[] a new standard of review" applicable to certain operations, "its measures would surely require notice and comment." 834 F.2d at 1051. That is exactly what the BEI does. The opt-in nature of the BEI does not alter the fact that it promulgates a legislative rule subject to notice and comment.

Defendants' argument that treating the BEI as a legislative rule would require notice-and-comment for every Innovation Center model component, Defs.' Mem. at 29–

14

30, proves too much. The BEI is unprecedented: no prior model component authorized distribution of specific consumer products—let alone THC-containing products—to Medicare beneficiaries. The BEI is not a commonplace model component involving payment methodologies and quality benchmarks, which are standard features of § 1115A models. It is a distribution system for cannabinoid substances to Medicare patients.

## B.   The BEI is arbitrary and capricious.

Defendants point out that the BEI addresses hemp, not marijuana, and so there is no inconsistency with the April 2025 rule. *See* Defs.' Mem. at 32–34. This distinction collapses under scrutiny. Delta-9 THC remains a Schedule I drug under the Controlled Substances Act, whether derived from marijuana or hemp.[1] Under the 2018 Farm Bill, hemp can only be a source of delta-9 THC if it has a concentration of 0.3% or less delta-9 THC by dry weight. Congress itself narrowed the definition of "hemp" in the FY2026 Agriculture Appropriations Act, establishing a total THC limit of 0.4 mg per container effective November 2026. The BEI authorizes products containing up to 3 mg of delta-9 THC per serving—some of which may exceed 2018 Farm Bill requirements.[2] If the products the BEI distributes either are illegal or will soon be illegal under federal law, CMS cannot claim it was reasonable to create a distribution program without

_____

[1] Plaintiffs are aware of the President's recent decision to reschedule cannabis as a Schedule III substance. That decision's legal and policy merits are beyond the scope of the current suit. As of now, delta-9 THC remains a Schedule I substance under the CSA.

[2] The 2018 Farm Bill defines "hemp" as the cannabis plant and any part of that plant with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis (7 U.S.C. § 1639o(1)). For example, a 1-gram product containing 3 mg of THC would have a concentration of 0.3% or higher, directly violating that statutory hemp threshold and making it marijuana under the Farm Bill and Controlled Substances Act.

acknowledging the impending statutory change. Authorizing products that are illegal (or soon-to-be) for Medicare distribution is either capricious in and of itself or arbitrary in the sense that one part of the government is acting in a way that contradicts another part of the government—or both.

The April 2025 rule addressed "cannabis products" broadly and found they "do not have a reasonable expectation of improving or maintaining the health of the chronically ill." 90 Fed. Reg. 15,792, 15,867. Hemp and marijuana are both forms of cannabis containing the same chemical constituents. The sole difference is THC concentration. Hemp-derived THC, currently, is harvested, concentrated into a substance that far exceeds the THC limits for compliance with federal law, and dosed into consumable products. CMS has never explained why products containing up to 3 mg of delta-9 THC—the same psychoactive compound that made marijuana products ineligible—suddenly became safe for elderly Medicare beneficiaries. That is because they cannot do so. This has nothing to do with any statutory or regulatory line drawn between hemp and marijuana and everything to do with the THC concentration authorized for distribution by CMS through the BEI. Whether the consumer product so distributed is labeled "hemp" or "marijuana" is irrelevant.

Moreover, the BEI's compliance framework is illusory. The program's public information is a short FAQ on CMS's website that identifies no entity responsible for overseeing product testing, references "quality and safety standards" and "third-party testing" without identifying any oversight mechanism, and delegates compliance to the

16

very parties CMS is supposed to regulate. *See* Fishman Decl. (Doc. No. 30-2). This absence of any meaningful compliance framework is itself arbitrary and capricious.

When an agency reverses course, it must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–516 (2009)). CMS provided none. The BEI was announced on a website with no administrative record, no reasoned explanation, and no safety analysis. CMS also failed to consider important aspects of the problem, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)—including voluminous peer-reviewed evidence of cardiovascular harm, liver injury, drug interactions, and cognitive harm; pervasive contamination and mislabeling of CBD products; the absence of any FDA regulatory framework for cannabinoids; and the near-total lack of clinical research on cannabis use in populations over 65. Each failure independently renders the BEI arbitrary and capricious.

### C.    The CY2027 Rule confirms the BEI's arbitrariness.

Defendants dismiss the CY2027 Rule as irrelevant because it concerns Social Security benefits under Title XVIII. Defs.' Mem. at 34–35. But the CY2027 Rule contains CMS's blanket acknowledgment that its "authority does not extend to the direct regulation of cannabis-derived products" and that "any changes to SSBCI requirements will be made by requesting public comment on a proposed regulation through a Notice of Proposed Rulemaking." 91 Fed. Reg. 17,384, 17,432-33 (Apr. 6, 2026). If CMS recognizes that it must use notice-and-comment for cannabis-derived products under Title XVIII, its

17

claim to broader authority under § 1115A is arbitrary. The CY2027 Rule also confirmed that the only permissible hemp-derived products are hulled hemp seed, hemp seed protein powder, and hemp seed oil—basic food-grade ingredients. *Id.* at 17,432. The BEI authorizes far broader products without any of those procedural protections.

### D.    The major questions doctrine applies.

Defendants minimize the BEI as "voluntary" and "capped at $500 per beneficiary." Defs.' Mem. at 35. But the major questions doctrine turns on "the sheer scope of . . . [the] claimed authority" and whether the action is "unprecedented." *West Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022). CMS has never used § 1115A to distribute consumer products to Medicare beneficiaries. The BEI applies to models covering a substantial portion of the Medicare population. It was championed by CMS Administrator Oz and announced in conjunction with a presidential executive order. It creates the first federal pathway for non-FDA-approved cannabinoid products in Medicare. That is a big regulatory deal, much bigger than any individual $500 transaction or even the significant economic aggregate of all such transactions. CMS has pointed to no clear congressional authorization for using § 1115A's narrow grant of authority in this manner.

### E.    The BEI conflicts with federal law.

Defendants assert hemp is not a controlled substance and there is no conflict with federal law. *See* Defs.' Mem. at 35–36. But the FY2026 Agriculture Appropriations Act establishes a total THC limit of 0.4 mg per container effective November 2026. Moreover, current law requires less than 0.3% THC per pound of dry weight hemp. The BEI allows products containing up to 3 mg of delta-9 THC per serving—meaning products approved under the BEI may well be illegal under current or future law. CMS's admission that it

"will adjust its definition in accordance with the law" only confirms that the BEI as currently constituted conflicts with a federal law that Congress passed and the president signed. Moreover, the FDA's enforcement discretion memorandum does not cure this deficiency: a decision not to enforce statutory requirements is not a determination that they do not apply. The BEI authorizes distribution of products to "improve symptom control"—an action to "mitigate" and "treat" disease—the very functions requiring FDA-approved labeling and premarket approval. *See* 21 U.S.C. §§ 352, 355.

F.    **The BEI violates the Fifth Amendment.**

Incredibly, Defendants seek to dismiss Plaintiffs' constitutional claims in two paragraphs. Defs. Mem. at 36–37. On equal protection, they argue consulting hemp companies about a hemp program is "rational" and that MMJ is "not similarly situated" to Charlotte's Web. *Id.* at 36. But the relevant comparison is between two categories of regulated parties developing cannabinoid products for the same Medicare populations. Both seek to provide cannabinoid products to Medicare beneficiaries through different pathways. CMS chose to provide advance notice only to parties bypassing FDA approval while excluding those who invested in it. Under *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), a class-of-one claim requires intentional differential treatment of similarly situated parties without rational basis. MMJ Plaintiffs have alleged exactly that.

Defendants assert that the rational basis for its choice to exclude MMJ Plaintiffs is "self-evident." Defs. Mem. at 36 (citing *Sanchez v. Off. of the State Superintendent of Educ.*, 45 F.4th 388, 396 (D.C. Cir. 2022)). But no legitimate purpose is served by excluding pharmaceutical developers pursuing FDA approval while consulting only with

19

companies that benefit from bypassing it. Regardless of where Charlotte's Web and MMJ Plaintiffs derive their THC, the relevant distinction is between companies following the established FDA approval process for cannabinoid therapeutics and those that do not.

On due process, Defendants argue there is "no protected property interest in the expected future value of an unapproved pharmaceutical product." Defs. Mem. at 36–37. The Fifth Amendment requires notice and an opportunity to be heard before the government takes action affecting protected interests. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). CMS implemented the BEI—with binding eligibility criteria, product specifications, implementation plan requirements, and CMS approval authority—without any notice, public participation, or Federal Register publication, eleven days after posting it on a website. This is a straightforward procedural due process violation. As to substantive due process, MMJ Plaintiffs entered the federal pharmaceutical regulatory pathway in reliance on an established framework. The BEI retroactively undermines that framework by creating an alternative pathway that devalues the FDA approval MMJ is pursuing. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (finding "the core" of due process is "protection against arbitrary action").

### IV.   Plaintiffs Will Suffer Irreparable Harm

#### A.   Procedural harm is irreparable.

The deprivation of the right to participate in notice-and-comment rulemaking is itself irreparable harm. *Nat'l Treasury Emps. Union v. Newman*, 768 F. Supp. 8, 10 (D.D.C. 1991); *Veneman*, 289 F.3d at 94-95 (D.C. Cir. 2002). Every Plaintiff would have filed comments had the BEI proceeded through proper rulemaking. Defendants contend that procedural harm cannot independently establish irreparable harm when the underlying

claim fails, citing *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 17 (D.D.C. 2017). Defs. Mem. at 38. But that argument assumes in circular fashion that the procedural claim fails on the merits, which it does not. *See Veneman*, 289 F.3d at 94–95.

### B.    Competitive harm is irreparable.

MMJ Plaintiffs suffer ongoing, irreparable competitive harm. Every day the BEI is in effect, unvalidated cannabinoid products gain market access in the Medicare population, undermining the commercial viability of the FDA-approved products MMJ is developing. *See Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43 (D.D.C. 2000). Defendants say that these injuries are "speculative projections." Defs.' Mem. at 37. This flippancy ignores that the BEI is actively undermining MMJIH's market. Defendants' additional argument that injuries are "fully remediable," *id.*, misunderstands competitive harm: each day the BEI normalizes non-FDA-approved cannabinoid products in Medicare, the competitive landscape shifts irreversibly.

### C.    Public health harm is irreparable.

Defendants argue hemp products are already commercially available. *See* Defs.' Mem. at 38–39. But the BEI does something qualitatively different: it introduces these products into the Medicare delivery system with the imprimatur of the federal government and a physician's recommendation. Defendants' suggestion that the BEI's "safeguards" make it safer than retail availability is belied by the record: the FAQ identifies no entity overseeing product testing, no clinical guidelines, no adverse event reporting mechanism, and no dosing standards. CMS disclaims "claims regarding the therapeutic value of these products" yet requires physicians to certify that hemp use is "safe and appropriate." A program that disclaims therapeutic value while requiring

physicians to vouch for safety does not safeguard anyone. It is an invitation to malpractice lawsuits.

## V.    The Balance of Equities and Public Interest Favor Relief

"There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Defendants argue the public interest weighs against relief because Congress created CMMI for flexibility. Defs. Mem. at 39–40. But Congress did not authorize CMS to bypass notice-and-comment, distribute THC-containing products without safety analysis, or create an unprecedented product-distribution program without public participation. An injunction enforces Congress's judgment that agencies must follow the law.

A stay would return us to the status quo prevailing less than a month ago, prior to April 1, 2026. The government has no legitimate interest in implementing an unlawfully adopted rule. *See Veneman*, 289 F.3d at 94–95.

## VI.    Defendants' Motion to Dismiss

Defendants style their dispositive arguments as a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction. But the vast majority of what Defendants characterize as "jurisdictional" is nothing of the sort. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and jurisdiction to review agency action under 5 U.S.C. §§ 701–706. Sovereign immunity is waived for APA claims seeking relief other than money damages. 5 U.S.C. § 702. The only genuinely jurisdictional question under Rule 12(b)(1) is whether Plaintiffs have Article III standing—which, as demonstrated in Section I, they do on multiple independent bases.

Defendants' remaining arguments—that Plaintiffs fall outside the zone of interests of relevant statutes, that § 1115A(d)(2) precludes review, and that no statute provides a cause of action—are not jurisdictional. The Supreme Court made clear in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014), that the zone-of-interests inquiry "does not implicate subject-matter jurisdiction" and is instead a question of whether "a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 127. The D.C. Circuit has applied *Lexmark* to hold that the zone-of-interests test is not a jurisdictional question, but a merits issue. *CSL Plasma Inc. v. U.S. Customs & Border Protection*, 33 F.4th 584, 588 (D.C. Cir. 2022) (recognizing "the non-jurisdictional nature of the zone of interests test"). To the extent Defendants seek dismissal on cause-of-action or zone-of-interests grounds, the proper vehicle is Rule 12(b)(6), not Rule 12(b)(1)—a distinction with significant procedural consequences, including burden of proof and the ability to consider evidence beyond the pleadings. *See Potter v. Cozen & O'Connor*, 46 F.4th 148, 154–55 (3d Cir. 2022).

Defendants' reliance on § 1115A(d)(2) as a jurisdictional bar fares no better. Defendants invoke *Block v. Community Nutrition Institute*, 467 U.S. 340, 353 n.4 (1984), for the proposition that statutory preclusion is "jurisdictional." Defs. Mem. at 7. But that dictum predates the Supreme Court's systematic clarification of the jurisdictional label. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515–16 (2006) (holding that unless Congress "clearly states" a limitation is jurisdictional, courts should treat it as non-jurisdictional). Even assuming § 1115A(d)(2) could limit this Court's authority in some circumstances, it does not reach Plaintiffs' procedural claims. As explained in Section II.A, *Regeneron*

23

*Pharmaceuticals* held that § 1115A "does not bar review of the propriety of the procedures used for establishing" Innovation Center models. The Second Circuit's analysis in *Yale New Haven Hospital* confirms this conclusion: conducting a careful textual analysis of ACA-era preclusion provisions, the court found that Congress's omission of the phrase "the establishment of" from § 1115A's preclusion bar was not an invitation to preclude procedural challenges, but rather reflected the statutory structure's silence on procedure. And the "strong presumption that Congress intends judicial review of administrative action," *Bowen*, 476 U.S. at 670, requires evidence of a contrary legislative intent before courts may restrict access to review. Defendants have offered no such evidence.

As mentioned above, Defendants further argue that Plaintiffs' procedural challenge is merely a "backdoor" substantive challenge and that the decision to add a model element—"including the process by which that element is added"—falls within § 1115A(d)(2)'s preclusion scope. Defs. Mem. at 27. This argument fails for the reasons addressed in Section II.A, but to reiterate, as the D.C. Circuit has explained, the APA's procedural requirements "support several important functions wholly distinct from judicial review" and are "enforceable apart from the reviewability of the underlying action." *Reno,* 57 F.3d at 1134. To hold that § 1115A silently repealed these protections would mean that CMS could adopt any model element—distributing any product, imposing any condition—without ever following notice-and-comment procedures, without any public participation, and without any court having the authority to say otherwise. That cannot be what Congress intended when it created a testing authority for "innovative payment and service delivery models." 42 U.S.C. § 1315a(a)(1).

No other jurisdictional barrier supports dismissal. Plaintiffs do not seek benefits determinations, provider reimbursement, or participant-specific Medicare payment review. The Medicare channeling requirements of 42 U.S.C. § 405(h) accordingly do not apply. *See Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 19 (2000) (channeling requirements do not apply where they would result in "complete preclusion of judicial review"). And this Court need not reach any exhaustion question because no adequate administrative remedy exists for a pre-enforcement APA challenge to CMS's wholesale failure to conduct notice-and-comment rulemaking.

For all these reasons—and for the reasons detailed in Sections I through V addressing standing, reviewability, likelihood of success on the merits, irreparable harm, and the balance of equities—Defendants' motion to dismiss should be denied.

## VII.  Conclusion

For the above reasons, Plaintiffs respectfully request that this Court enter an order:

a.  Preliminarily enjoining Defendants from implementing, applying, or enforcing the BEI pending resolution of this action on the merits pursuant to Rule 65(a);

b.  Staying the effective date of the BEI pending conclusion of judicial review under 5 U.S.C. § 705;

c.  Denying Defendants' Motion to Dismiss; and

d.  Granting such other and further relief as the Court deems just and proper.

Date: April 24, 2026

Ilya Shapiro
  DC Bar #489100
  Admitted to D.D.C. *pro hac vice*
**BURKE LAW GROUP, PLLC**
2001 L Street NW, Suite 500
Washington, D.C. 20036
ilya.shapiro@burkegroup.law

Patrick Kenneally
  IL Bar #6286573
  *Pro hac vice* motion forthcoming
**BURKE LAW GROUP, PLLC**
205 N Michigan Avenue, Suite 810
Chicago, Illinois 60601
patrick.kenneally@burkegroup.law

Respectfully submitted,

  */s/Connor W. Mighell*

Connor W. Mighell
  TX Bar #24110107
  D.D.C. Bar ID #TX0032
**BURKE LAW GROUP, PLLC**
1000 Main Street, Suite 2300
Houston, Texas 77002
Telephone: (832) 987-2214
Fax: (832) 793-0045
connor.mighell@burkegroup.law

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that, on April 24, 2026, I electronically filed the foregoing Reply in Support of Plaintiffs' Motion for Preliminary Injunction and Stay of Agency Action Pending Judicial Review and this Certificate of Service with the Clerk of Court for the United States District Court for the District of Columbia by using the CM/ECF system, which will accomplish service on all registered parties.

/s/Connor W. Mighell
Connor W. Mighell

27